2pw211
197  438

ASHCOM surviving administrator of MOORE *against* SMITH.

### IN ERROR.

Where land is sold by public vendue, and the advertisement described the tract as containing 300 acres, and upon the day of sale, doubts being expressed as to the quantity, the vendor said "he would sell it at 300 acres, more or less, he would sell it by the acre, and it should be measured;" and it is cried and sold at so much per acre, the vendee is bound to take it, although upon a survey it is subsequently ascertained that there is an excess of forty-five acres.

If the vendee refuse to carry the sale into execution, and the vendor makes a re-sale at a less price, the vendee is liable in damages to the vendor for the loss sustained.

And where the vendor has acted *bona fide*, and with reasonable care, the measure of damages is the difference of price on the re-sale. But his conduct may be so grossly improper as to cast a loss from it on himself.

Where each of the parties to a contract treat a matter as doubtful, and is content to take the risk of its turning out in a particular way, Chancery will certainly not relieve against the event.

The object of an advertisement for a public sale of land, is to give notice of the fact that a sale is intended, to attract bidders, leaving the terms to be settled on the ground. The conditions of sale are superadded as a distinct matter, by the auctioneer, and published by parole or writing; and will control the advertisement.

ERROR to the Court of Common pleas of Bedford county.

The plaintiff in error, who was also plaintiff below, brought suit against the defendant to recover the difference between the amount which had been bid by him for the real estate of *John Moore*, deceased, at a public vendue held by *Barclay* and *Ashcom*, administrators with the will annexed of the said *Moore*, and the sum for which at a subsequent sale they sold it to another, after the defendant had refused to carry the contract into execution. The defendant resisted the recovery on the ground that the land sold had been advertised as "300 acres of patented land," and as he alleged he had bought by the acre, that quantity only, he contended he was not bound to take 345 acres and 35 perches, the quantity which the tract, by a survey subsequently made, was ascertained to contain. And as there had been a mistake as to this excess, he insisted that he was entitled to be relieved from his contract on this ground. Much evidence was given on both sides as to this point.

The land sold was contained in two patents to *John Moore*, the one for 99 acres and 11 perches, the other for 129 acres and 103 perches: of which it seemed that *John Moore* in his life time had sold 21 acres, off the 99 acre tract.

(Ashcom *v.* Smith.)

On the 18th February, 1825, the administrators, *Barclay* and *Ashcom*, in pursuance of the power vested in them by the will of *Moore*, advertised in a newspaper published in Bedford, the sale of this land. So much of the advertisement as is material was as follows:

"Will be sold on the 14th of March, 1825, the mansion place containing 300 acres of patented land, and the usual allowance for roads, &c. One third of the purchase money in hand. Should the highest bidder fail to comply with his bid, the sale to be returned to the next highest bidder if he choose to take it. The residue in three equal annual payments without interest, to be secured by bonds and mortgage."

It was proved that at the time of the sale, and before it commenced, the quantity contained in the tract, was the subject of conversation, that *Mr. James Piper*, a surveyor, said that he had run some of the lines or saw them run, and that he would warrant it to hold out 300 acres, and that *Mr. Barclay* then said "they would sell it at 300 acres, more or less; and it should be measured; and that they would sell it by the acre." That it was put up and the bidding commenced with spirit, and after some time it was struck down to *Smith*, the defendant, at $18 per acre. Many witnesses were examined to prove what had taken place at the sale, who proved that it was generally understood and supposed by the bidders, that the tract would contain 300 acres, exclusive of the land which had been sold off; although the quantity called for in the patents was less, and that it was taken to be 300 acres "by those who were making their calculations, and bidding." All the witnesses agreed that it was cried by the acre.

*Ashcom*, the plaintiff, having executed a release to *George Moore* and others, and paid into Court a sum sufficient to cover the costs in the Common Pleas, and Supreme Court, was received as a witness, and a bill of exceptions to his admission sealed.

He testified that on the morning of the sale the defendant had taken him to one side, and asked him "how he intended to sell this land?" that he told him, "by the acre, we dont know what quantity there is, and therefore we will have to get it surveyed," that he had no doubt that it would hold out 300 acres, although after deducting the land which had been sold off, the patent called for 279 or 280 acres. The witness also stated that he was mistaken in the quantity of land, and he believed that every man there was mistaken.

It was in proof that after the property was struck off to *Smith*, and for some time after, before a survey was made, he expressed great satisfaction with his bargain.

(Ashcom *v.* Smith.)

A few days after the sale the defendant called on *Mr. Barclay* and offered to make the first payment on account of his purchase, according to the quantity called for by the patent. *Barclay* said he was not quite ready for him; that the land would have to be surveyed to ascertain the number of acres, and that he would then get his deed; that it was then written, and when the survey was made the blanks would be filled up.

Two surveyors were then proposed to the defendant by Mr. *Barclay*, either of whom should make the survey. But whether the defendant agreed to the selection of a surveyor, and acquiesced in making a survey, or insisted on having the land according to the patent, and advertisement, and that no survey should be made, were points about which conflicting evidence was given. It seemed however that *Smith* agreed to be present when the survey was made.

Some time after a survey was made by Mr. *Patterson* one of the persons who had been named to make it. The defendant was present. The lines were found to be longer than the patent called for. The line going up the mountain called for fifty-one and one half perches, at which the surveyor stopped, but Mr. *George Moore*, a son of the testator, said, the corner was higher up; and they run out so as to make this line seventy-two perches. It was in proof that the orchard was up to the mountain line. This survey ascertained the quantity to be 376 acres and 41 perches, strict measure, and 354 acres and 162 perches with the allowance. *Smith* appeared dissatisfied when the land was extended up the mountain. The land above 51½ perches was of little value.

On the 30th March, 1825, the administrators executed a deed to the defendant, according to *Patterson's* survey for 376 acres 41 perches, which they tendered to him, but he refused it and objected to the quantity of the land, and that if he took it he would be compelled to pay more money than he expected. On the 11th April following, the administrators served the defendant with a notice in writing, that "If he did not before the 16th day of May next, come forward and comply with his contract for the purchase of the mansion place of the late *John Moore, Esq.* deceased, by paying the one-third of the purchase money, and giving bond and mortgage for the residue, according to the terms of his purchase, made on the 14th day of March last, they would on the said sixteenth day of May, expose the said premises again at public sale, and bring a suit or suits against him for the difference, if any there should be, in the sales, and also for the other damages and losses sustained by the estate of the said *John Moore*, by his refusal to comply with said contract."

(Ashcom v. Smith.)

And on the 29th of April they advertised the land to be sold on the 16th of May.

After this another survey was made by the procurement of the administrators, by which the tract was made to contain 345 acres and 35 perches, and the allowance, and on the 18th June the administrators executed another deed to the defendant for 345 acres and 35 perches, according to this survey, which on the same day they tendered to him and served him with the following notice:

"Sir—Take notice that on the 20th day of June inst. unless before that day you comply with your contract for the purchase of the mansion place of *John Moore, Esq.*, deceased, made on the 14th day of May last, agreeably to the terms of the said purchase; the undersigned administrators with the will annexed of the said *John Moore*, deceased, will again expose to sale by public vendue on the premises, the said mansion place, and will bring a suit against you for damages for non-compliance with the said contract, and for whatever difference there may be between the two sales."

*Mr. Smith* refused to accept this as he had done the first deed tendered to him. The land was frequently afterwards exposed to sale by the administrators, and was finally sold by public vendue on the 5th of April, 1826, to Jacob Barndollar, at $10 26 per acre.

The Court charged the jury among other things:

"Our first inquiry will be, how was the land sold? Is it not manifest it was sold by the acre? and is it not clear that the parties estimated the quantity at 300 acres, a little more or less. The effect of the words 'more or less' has not been well fixed by judicial decisions. In Pennsylvania, where the contract is consummated by delivery and acceptance of a deed on the one side, and the giving bond and mortgage on the other; the vendee will hold all the surplus land within the boundaries, without paying for it—and generally he will not get any deductions, because he does not get the estimated quantity.

"While the contract is in *fieri*, and when there is to be a survey, the actual quantity is to be paid for, and the actual quantity will be the true contract of the parties. In *Frederick* v. *Campbell*, Judge *Duncan* says, 'more or less' in a conveyance sometimes extends to a small difference, sometimes leaves the quantity indeterminate. In Virginia, 'more or less' is restricted to a reasonable or usual allowance for small errors in surveys and for variations in instruments.

"It has been decided in England that the words 'more or less' ought only to clear a small deficiency when the contract rests *in*

(Ashcom *v.* Smith.)

*fieri.* Here the patent calls for 298 acres and 114 perches, 20 acres or thereabouts had been sold off. The patent quantity left was about 279 acres. *Piper* had given notice that the lines were longer on the ground than they purported to be, and that he was very confident there were 300 acres or a little more. *Morrison* swears that *Mr. Barclay,* one of the administrators, then said, we will sell it at 300 acres more or less, it should be measured and they would sell it by the acre. You have heard the evidence as to the admeasurement, that there was a large surplus. The first deed tendered for 376 acres, 41 perches, and the second for 345 acres, 35 perches. The plaintiffs themselves have shown by their own conduct, that *Smith* was not bound to accept the first deed. Was he bound to accept the second? This matter will depend on a number of considerations. It is a general principle that agreements relating to real or personal estate, if founded in mistake, will for that reason be set aside. Were the parties mistaken in the quantity? You have heard the evidence of *Mr. Ashcom,* one of the administrators; he swears that he was mistaken in the quantity, and he adds that he believes every man there was mistaken. He further swears that *Mr. Smith,* when the first deed was tendered, said there was too much land, and that he expressed no dissatisfaction until after the survey was made. If there was a clear mistake in the quantity, either party is entitled to be relieved from that error. Here no agreement had been made. It was a public sale, and we think, if you are satisfied, that the defendant believed, and he had reason to believe from the advertisements and the information given by the sellers, that the tract only contained 300 acres, or a little ' more or less,' he was not bound to take the 345 acres. The difference was $814 75, a large sum to a farmer—a sum that might on a mortgage, sell the best plantation in the country.''

A verdict having passed for the defendant, the plaintiff brought this writ of error and assigned for error,

"1. That the Court erred in that part of the charge, where they instruct the jury, that if they were satisfied that the defendant believed, and had reason to believe, from the advertisements, and the information given by the sellers, that the tract only contained 300 acres or a little ' more or less,' he was not bound to take 345 acres.

"2. The Court erred by submitting it, under the facts disclosed in this case to the jury, as a question of fact for the jury to determine whether the defendant was mistaken in the quantity of land contained in the tract sold, with instruction that if he were, he was not bound to comply with the contract.

"3. Also as to the meaning of the words ' more or less.' ''

(Ashcom *v.* Smith.)

*Barclay* for the plaintiff in error

Argued that the Court erred in charging the jury, that if the defendant believed that the tract contained 300 acres, or a little more or less, he was not bound to take 345 acres.

Where the parties treat upon the basis, that the fact which is the subject of the agreement, is doubtful, and the consequent risk each is to encounter is taken into consideration in the stipulations assented to, the contract will be valid notwithstanding any mistake of one of the parties, provided there be no concealment or unfair dealing by the opposite party, which would affect any other contract.   *Perkins* v. *Gay*, 3 *Serg. & Rawle* 327.

The mere circumstance of the advertisement describing the tract of land as containing 300 acres, is not of itself sufficient to prevent a chancellor from compelling the execution of the contract, although it turned out that there was an excess of 45 acres ascertained by the subsequent survey. *Boar* v. *Moore's administrators*, 1 *Serg. & Rawle*, 166.

It was not pretended that there was any fault in the administrator.   He had used no artifice, nor made any representation to induce the defendant to purchase, or believe there was not a greater quantity than 300 acres in the tract.

Where the words " more or less " are used they show the understanding of the parties to be that the contract is not to be affected by a deficiency, or surplus of quantity, and in such case, chancery would not interfere.   *Glen* v. *Glen*, 4 *Serg. & Rawle*, 488.   *Large* v. *Penn*, 6 *Serg, & Rawle*, 488.

Where a sale of land is by the acre, the right of ascertaining the quantity by a survey exists, whether reserved or not, and if no time be limited, it may be done at any time before the business is closed.   *Bailey* v. *Snyder's administrators*, 3 *Serg. & Rawle*, 160.

*Burd* for the defendant in error

Contended that the contract was by parole and executory; and if equity would not decree a specific performance of the contact, the plaintiff should not be permitted to recover in this suit, which is an equitable action: and he contended that the performance of the contract would not have been decreed.

The plaintiff before he asks equity must do equity.   By his advertisement, and a reference to the patents he induced the belief that the tract of land sold contained the specific quantity of 300 acres.   This was not mere description, but substance, upon which every bidder made his calculations, and measured the extent to which in prudence he could go.   As to this quantity there was a

(Ashcōm *v.* Smith)

plain mistake, the plaintiff himself stated that he had been mistaken, and that every bidder on the ground was mistaken as to the quantity. The mistake was mutual, and when a contract is made upon a mistake, equity will not interfere to enforce it. *Sugd. on Ven.* 22. 2 *Hen. & Mum.* 174. *Sugd. on Ven.* 167.

So where a vendor gives a false description, equity will not decree a performance of the contract. *Sugd.* 211, *M'Ferran* v. *Taylor,* 3 *Cranch.* 270.

In the case of *Bailey* v. *Snyder's administrator,* the contract was executed, and equity could not relieve in such place, unless positive fraud was established, but in the case at bar, the contract was in *ficri,* and the plaintiff called on equity to support it.

He contended, that the advertisement of the administrators as to the quantity of the land, amounted to an assertion on their part which they were bound to make good. *Frederick* v. *Cambell,* 14 *Serg. & Rawle,* 293. 2 *Sch. & Lef.* 554.

*Miles* in reply.

The parol testimony is to be taken in connection with the advertisement. Taking all the evidence together, it appears that although it was supposed there were but 300 acres in the tract sold, the quantity was considered uncertain ; and it was agreed that this uncertainty should be brought to a certainty by an actual survey. The question then comes to this, whether the circumstance of the ascertained excess of forty-five acres, afforded evidence *per se* of such mistake, that the defendant had a right on this ground to rescind the contract. There was no suppression of the truth, no suggestion of a falsehood, but both parties were equally ignorant of the subject of the contract, and both treated of it as uncertain; as the subject of conjecture; and to be reduced to certainty in future. In such case chancery will not interpose to relieve a party from his contract. 1 *Mad. Chan.* 76.

Here too the parties had equal means of information as to the subject-matter of the contract. 1 *Call.* 320.

Should the doctrine laid down by the Court prevail, no contract which is not specifically certain, would be permitted to stand.

The quantity of the land was a mere matter of description; the substance and essence of the agreement was that the administrators should sell and convey, and the defendant should buy the land, and pay so much for every acre it contained. Perhaps where the quantity of the excess or deficiency was so great as to afford internal evidence of a very gross mistake, equity might relieve,

28

(Ashcom *v.* Smith.)

but that was not the case here, the excess was not such as to pro-duce evidence of serious misapprehension.

The opinion of the Court was delivered by

GIBSON, C. J.—The principle on which the cause was put to the jury, was that of mistake, for which, they were instructed, that the contract ought not to be enforced. The cases on which reliance is placed for this, are inapplicable. The difference between a deficit for which an abatement is claimed where the land has been sold for a round sum, and an excess, for which a recision of the contract is claimed where it has been sold by the acre, is plain and pal-pable. In the one case, the vendee is a loser to the extent of the difference; and in the other he gets value for whatever he has to pay. Yet our reports furnish no instance of an abatement, even where the difference was considerable; or where the principle has been sanctioned further than to admit that there may be extreme cases in which chancery would infer some great misapprehension, and on that ground relax the rules of law. *Boar* v. *McCormick*, 1 *Serg. & Rawle*, 168. Equity will indeed relieve against a plain mistake, as well as against misrepresentation and fraud. But can mistake be alleged in a matter which was considered as *doubtful*, and treated accordingly? Where each of the parties is content to take the risk of its turning out in a particular way, chancery will certainly not relieve against the event. Reference to a train of authorities for this, is given in *Perkins* v. *Gay*, 3 *Serg. & Rawle*, 331; and I shall therefore bring into view only the case of *Smith* v. *Evans*, 6 *Bin.* 102, in which land was sold by the acre, but according to an *estimate* of the quantity which was held to be conclusive, though it appeared by subsequent measurement that there was a deficit of eighty-eight acres; the Chief Justice remarking that *the quantity was not an essential part of the contract*. What, then, is the case here? The advertisement in the True American, by which the premises were described as three hundred acres of patented land, was no part of the condi-tions of the sale, which, had they been in writing, would have controlled all private representations. The office of an adver-tisement, both here and England, is to give notice of the fact that a sale is intended, and the object of the description is to at-tract bidders, leaving the terms to be settled on the ground. Even were the conditions published beforehand, the vendor would not be precluded from changing them, as he may sell on his own terms, or not at all. The conditions are therefore superadded as a dis-tinct matter by the auctioneer, and published by parol or in wri-ting. Where indeed the advertisement is referred to as contain-

(Ashcom *v.* Smith.)

ing the conditions, it will no doubt, answer the purpose: but it is not pretended here that the land was sold by the advertisement, or in gross, or as containing a definite quantity, or any other way than by the acre. The witnesses substantially agree as to the representation of the vendors, although they use different terms.; such as " the calculation was 300 acres—*supposed* to be 300 acres, offered *at* 300 acres—admitted to be 300 acres *and upwards*— understood to be *about* 300 acres and upwards—300 acres *and probably exceeding it:* from which it is clear that the vendors sold by an estimate, without pledging themselves for its accuracy.

This is put beyond a doubt by the fact that the vendee, who was pleased with his bargain, appointed a day to pay part of the price, and concert measures to have the quantity ascertained by a survey.. Why then should he be released from the contract, if there were no misrepresentation or other want of fair dealing? The *excess is not even unusual,* being forty-five acres, or fifteen per cent.; and as to the quantity of the rough land being greater in proportion than was anticipated, that was a matter against which, having the means of information in his power, he was bound to take precautions, and cannot now object.

Where the vendor has acted *bona fide* and with reasonable care, the measure of damages is the difference of price on the re-sale. But his conduct may be so grossly improper as to cast a loss from it on himself; as where the re-sale is wantonly delayed while the land is notoriously falling in price, or the business is managed neg- ligently: these and many other circumstances may be properly left to the jury. But mere unskilfulness without *mala fides;* or even negligence, unless it be plain and palpable, will not be suf- ficient to charge him. The vendee ought not to cast the respon- sibility of the re-sale on the vendor, and by his own wrongful act charge any one else with the consequences. Having thought proper to render a second sale necessary, it must be at his own risk. It seems to me these principles must rule the cause, and that the court ought so to have directed the jury.

HUSTON, J.—From the manner in which this cause comes be- fore us I have had some doubts as to the correctness of the opin- ion of the Court; but on full reflection, I can see no error—at least none that the plaintiff in error can complain of.

There exists in the cause many matters which seem not to have been relied on below, and were not pressed here, and which, as the cause goes back, ought not to be considered as unworthy of reflection.

It would seem no written conditions of sale were put up at the time Smith bid; but the printed advertisement was in evi- dence, and described the property as " the mansion place, con-

(Ashcom *v.* Smith.)

taining 300 acres of patented land, with the usual allowance, &c. one third of purchase money in hand, &c. Should the highest bidder fail to comply with his bid, the sale to be returned to the next highest bidder if he choose to take it, the residue in three equal yearly payments, without interest, to be secured by bonds and mortgage."

Where no conditions of sale are put up, and a description and conditions are in the advertisement, these may be considered as the conditions; and these cannot be contradicted, or varied, by parol at the time of the sale, as it would introduce fraud and confusion. *Sugd. on Ven.* 212.

But it seems to have been proved, and not denied, that after the bid of 14 dollars per acre, there was no real bidder but *Smith*, the defendant, it was raised on him by a puffer or puffers instigated by those or one of those interested. This alone would seem to have been considered as a good reason why the real bidder is not bound. *Sugd.* 16 & *seq.*

The same writer tells us the usual conditions "that if the purchaser fail to comply with the conditions, the deposit shall be forfeited, and the owners be at liberty to re-sell, and the deficiency and all charges made good by the defaulter." If this latter clause is important it was not a part of the written or parol terms of this sale.

Public sales at auction, as well as private sales are precisely what the contract of the parties makes them; and I know of no authority for saying, it is an universal rule of all auctions, that the bidder failing to comply, shall be liable for the difference on a re-sale, if no conditions are put up—much less for saying that when written terms of sale, different from this are put up, this one shall be implied, or understood to be at all binding. There is manifest unfairness in publishing terms of sale, and a penalty for not complying, and after the sale deserting the written terms, and attempting to bind the party by different and greatly more penal conditions.

The effect of the words more or less, in conditions of sale, or articles of agreement, have been before this Court more than once—and the decisions are not precisely the same—at least it requires some ingenuity to reconcile them. The last case, on this subject, to me appears more consonant to the general understanding of the world, as well as sound principles of law than some of those which preceded it. In point of fact, when land is sold, and bought for the purpose of cultivation, the price always depends upon and is regulated by the quantity—and a learned judge or illiterate layman, in making a bargain, either as buyer or seller, equally know that 150 acres of land is better that 100 acres, all other things being equal, and

(Ashcom *v.* Smith.)

they know that quantity is not mere description, but as much the substance and consideration on the one side, as the quantity of money is on the other side.

This matter would seem to have been considered by the counsel in argument differently in this case from the manner in which it strikes me. It has been assumed that there were 346 acres and allowance, at least. There may have been and probably was evidence on this subject not before this Court, but on the evidence I see no reason for saying that this is the quantity:—In re-surveying up the mountain, as I understand it, the patent called for 51 perches, and the surveyor, without marks or corners corresponding to the patent, went on, making this line 72 perches. The reason given for this, that one corner of the orchard fence went so far, is not satisfactory. Many an one has extended his fence beyond his line:—and on a sale of land held by an old patent, it cannot be seriously contended, that the purchaser is bound to take and pay for mountain land, not patented—perhaps to much of which there is no right.

Suppose this quantity correct, what was the contract of the parties? Three hundred acres, more or less is sold by the acre, and the price per acre multiplied by 300 gives the aggregate price—and that overplus or deficiency is disregarded—thus 300 acres more or less at $10 per acre is $3000. Or it may be 300 acres, more or less, to be sold by the acre, and the land to be measured, and the purchaser to pay for each acre it contains, and in that way the tract in question by the present measurement, would, at 10 dollars per acre amount to 3450 dollars.

*Morrison* would seem to have understood it in the manner first stated—"It was before it was cried, that it was fixed at 300 acres, more or less:—some had been sold off and that gave rise to the doubt that there was not 300 acres. The calculation was made at 300 acres."

*Piper* says expressly "I understood it was selling at 300 acres 'more or less' and so is the printed advertisement explicitly." The first point then to be settled is, what was the contract? Did *Smith* understand it correctly or not, for he always insisted he was to pay for only 300 acres. Could the seller vary the terms from his written advertisement? and did he vary them so as to be understood by the defendant? if there was a misunderstanding is the defendant liable to a contract which he never understood! While all is executory can any Court compel him to comply with a contract to which he never agreed—or to pay for not complying?

I recognize fully the distinction taken by the Court, between a contract executed by accepting the deed, and giving bonds; and a contract in no part executed, and the terms of which were not

agreed on, about which there was a material dispute, and in such case chancery never decrees a specific performance. It will not be contended the plaintiffs could have recovered at law.

I then think the judge was right in leaving it to the jury to decide whether there was a mistake in quantity, and saying, "if there was, either party would be relieved—here no agreement was made. It was a public sale, and we think that if you are satisfied that the defendant believed, and had reason to believe from the advertisements, and the information given by the sellers, that the tract only contained 300 acres, or a little more or less, he was not bound to take 345 acres, the difference is $814 75—a large sum to a farmer, a sum that might on a mortgage sell the best plantation in the county." I also think he might have gone further, and held the plaintiffs to their printed advertisement, or at least said that the defendant was not liable beyond it. That if puffing, false bidding, was used by the vendors, or those in that interest, the defendant was not bound. This might have been very different if the deed had been accepted and bonds given; and the party had asked to be relieved, then the defendant could not say there was no contract—before this, and when no papers were signed, nothing precisely settled, I know of no principle, nor case, which makes a man liable, because in the course of a contract he thinks he and the other party understood each other, and because when they come to reduce it to writing he discovers that they did not understand each other, and then withdraws.

It will be observed that I have laid the testimony of *Ashcom,* the plaintiff, out of view. As the cause goes back I would refer to *Patton's adm'rs.* v. *Craig's adm'r.* 7 *Serg. & Rawle,* 116. I suppose the judge had that case in view when he admitted *Ashcom.* But they are very different. There the contract, loan, &c., was by *Craig* in his life-time to *Patton,* and the administrators were but trustees, without any interest—here the transaction was by *Ashcom,* himself, with the defendant, and if there be a loss to the estate; it may be there is no one liable, and this might be so if the heir caused the difficulty, or *Ashcom* may be liable, or the defendant.' This plaintiff is then as much interested as any other plaintiff in any suit, and we have not yet decided that every plaintiff may, by paying in the costs, be a witness. In the case cited, 7 *Serg. & Rawle,* 124, the late Chief Justice says—" at the commencement of the action he was a bare trustee, and there is no suggestion that he was *in any danger of being involved in a devastavit.* If any thing of that kind had appeared he would have been interested.

Judgment reversed and *venire de novo* awarded.