**CALIFORNIA AND HAWAIIAN SUGAR COMPANY, a California Corp., Plaintiff/Counterdefendant/Appellee/Cross-Appellant.**

**v.**

**SUN SHIP, INC., a Pennsylvania Corp., Defendant/Counterclaimant/Appellant/Cross-Appellee.**

Nos. 85–2310, 85–2356.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 14, 1986.

Decided July 22, 1986.

John Reese, Loyd D. McCormick, McCutchen, Doyle, Brown & Enersen, Graydon S. Staring, Lillick, McHose & Charles, San Francisco, Cal., for California & Hawaiian Sugar Co.

David Wilson, Ben I. Hamburg, Dinkelspiel, Donovan & Reder, San Francisco, Cal., for Sun Ship, Inc.

Before NELSON, CANBY and JOHN T. NOONAN, Jr., Circuit Judges.

NOONAN, Circuit Judge.

Jurisdiction in this case is based on the diversity of citizenship of California and Hawaiian Sugar company (C and H), a California corporation; Sun Ship, Inc. (Sun), a Pennsylvania corporation; and Halter Marine, Inc. (Halter), a Louisiana corporation. Interpreting a contract which provides for construction by the law of Pennsylvania, we apply Pennsylvania law. The appeal is from a judgment of the district court in favor of C and H and Halter on the main issues. Reviewing the district court's interpretation of the contract anew as a matter of law and respecting the findings of fact of the district court when not clearly erroneous, we affirm the judgment in all respects.

## BACKGROUND

C and H is an agricultural cooperative owned by fourteen sugar plantations in Hawaii. Its business consists in transporting raw sugar—the crushed cane in the form of coarse brown crystal—to its refinery in Crockett, California. Roughly one million tons a year of sugar are harvested in Hawaii. A small portion is refined there; the bulk goes to Crockett. The refined sugar—the white stuff—is sold by C and H to groceries for home consumption and to the soft drink and cereal companies that are its industrial customers.

To conduct its business, C and H has an imperative need for assured carriage for the raw sugar from the islands. Sugar is a seasonal crop, with 70 percent of the harvest occurring between April and October, while almost nothing is harvestable during December and January. Consequently, transportation must not only be available, but seasonably available. Storage capacity in Hawaii accommodates not more than a quarter of the crop. Left stored on the ground or left unharvested, sugar suffers the loss of sucrose and goes to waste. Shipping ready and able to carry the raw sugar is a priority for C and H.

In 1979 C and H was notified that Matson Navigation Company, which had been supplying the bulk of the necessary shipping, was withdrawing its services as of January 1981. While C and H had some ships at its disposal, it found a pressing need for a large new vessel, to be in service at the height of the sugar season in 1981. It decided to commission the building of a kind of hybrid—a tug of catamaran design with two hulls and, joined to the tug, a barge with a wedge which would lock between the two pontoons of the tug, producing an "integrated tug barge." In Hawaiian, the barge and the entire vessel were each described as a Mocababoo or push boat.

C and H relied on the architectural advice of the New York firm, J.J. Henry. It solicited bids from shipyards, indicating as an essential term a "preferred delivery date" of June 1981. It decided to accept Sun's offer to build the barge and Halter's offer to build the tug.

In the fall of 1979 C and H entered into negotiations with Sun on the precise terms of the contract. Each company was represented by a vice-president with managerial responsibility in the area of negotiation; each company had a team of negotiators; each company had the advice of counsel in drafting the agreement that was signed on November 14, 1979. This agreement was entitled "Contract for the Construction of One Oceangoing Barge for California and Hawaiian Sugar Company By Sun Ship, Inc." The "Whereas" clause of the contract identified C and H as the Purchaser, and Sun as the Contractor; it identified "one non-self-propelled oceangoing barge" as the Vessel that Purchaser was buying from Contractor. Article I provided that Contractor would deliver the Vessel on June 30, 1981. The contract price was $25,405,000.

Under Article I of the agreement, Sun was entitled to an extension of the delivery date for the usual types of force majeure and for "unavailability of the Tug to Contractor for joining to the Vessel, where it is determined that Contractor has complied with all obligations under the Interface Agreement." (The Interface Agreement, executed the same day between C and H, Sun, and Halter provided that Sun would connect the barge with the tug.) Article 17 "Delivery" provided that "the Vessel shall be offered for delivery fully and completely connected with the Tug." Article 8, "Liquidated Damages for Delay in Delivery" provided that if "Delivery of the Vessel" was not made on "the Delivery Date" of June 30, 1981, Sun would pay C and H "as per-day liquidated damages, and not as a penalty" a sum described as "a reasonable measure of the damages"—$17,000 per day.

On the same date C and H entered into an agreement with Halter to purchase "one oceangoing catamaran tug boat" for $20,350,000. The tug (the "Vessel" of that contract) was to be delivered on April 30, 1981 at Sun's shipyard. Liquidated damages of $10,000 per day were provided for Halter's failure to deliver.

Halter did not complete the tug until July 15, 1982. Sun did not complete the barge until March 16, 1982. Tug and barge were finally connected under C and H's direction in mid-July 1982 and christened the Moku Pahu. C and H settled its claim against Halter. Although Sun paid C and H $17,000 per day from June 30, 1981 until January 10, 1982, it ultimately denied liability for any damages, and this lawsuit resulted.

## ANALYSIS

Sun contends that its obligation was to deliver the barge connected to the tug on the delivery date of June 30, 1981 and that only the failure to deliver the integrated hybrid would have triggered the liquidated damage clause. It is true that Article 17 creates some ambiguity by specifying that the Vessel is to be "offered for delivery completely connected with the Tug." The case of the barge being ready while the tug was not, is not explicitly considered. Nonetheless, the meaning of "Vessel" is completely unambiguous. From the "Whereas" clause to the articles of the agreement dealing with insurance, liens, and title, "the Vessel" is the barge. It would require the court to rewrite the contract to find that "the Vessel" in Article 8 on liquidated damages does not mean the barge. The article takes effect on failure to deliver "the Vessel"—that is, the barge.

Sun contends, however, that on such a reading of the contract, the $17,000 per day is a penalty, not to be enforced by the court. The barge, Sun points out, was useless to C and H without the tug. Unconnected, the barge was worse than useless—it was an expensive liability. C and H did not want the barge by itself. To get $17,000 per day as "damages" for failure to provide an unwanted and unusable craft is, Sun says, to exact a penalty. C and H seeks to be "paid according to the tenour of the bond"; it "craves the law." And if C and H sticks to the letter of the bond, it must like Shylock end by losing; a court of justice will not be so vindictive. Breach of contract entitles the wronged party only to fair compensation.

Seductive as Sun's argument is, it does not carry the day. Represented by sophisticated representatives, C and H and Sun reached the agreement that $17,000 a day was the reasonable measure of the loss C and H would suffer if the barge was not ready. Of course they assumed that the tug would be ready. But in reasonable anticipation of the damages that would occur if the tug was ready and the barge was not, Article 8 was adopted. As the parties foresaw the situation, C and H would have a tug waiting connection but no barge and so no shipping. The anticipated damages were what might be expected if C and H could not transport the Hawaiian sugar crop at the height of the season. Those damages were clearly before both parties. As Joe Kleschick, Sun's chief negotiator, testified, he had "a vision" of a "mountain of sugar piling up in Hawaii"—a vision that C and H conjured up in negotiating the damage clause. Given the anticipated impact on C and H's raw sugar and on C and H's ability to meet the demands of its grocery and industrial customers if the sugar could not be transported, liquidated damages of $17,000 a day were completely reasonable.

The situation as it developed was different from the anticipation. The barge was not ready but neither was the tug. C and H was in fact able to find other shipping. The crop did not rot. The customers were not left sugarless. Sun argues that, measured by the actual damages suffered, the liquidated damages were penal.

We look to Pennsylvania law for guidance. Although no Pennsylvania case is squarely on point, it is probable that Pennsylvania would interpret the contract as a sale of goods governed by the Uniform Commercial Code. *Belmont Industries, Inc. v. Bechtel Corp.*, 425 F.Supp. 524, 527 (E.D.Pa.1976). The governing statute provides that liquidated damages are considered reasonable "in the light of anticipated or actual harm." 12A Pa.Cons.Stat. Ann. 2–718(1) (Purdon 1970) (Pennsylvania's adoption of the Uniform Commercial Code).

The choice of the disjunctive appears to be deliberate. The language chosen is in harmony with the Restatement (Second) of Contracts § 356 (1979), which permits liquidated damages in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. Section 356, Comment b declares explicitly: "Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the

contract, even though it may not approximate the actual loss."

Despite the statutory disjunctive and the Restatement's apparent blessing of it, the question is not settled by these authorities which must be read in the light of common law principles already established and accepted in Pennsylvania. *Carpel v. Saget Studios, Inc.*, 326 F.Supp. 1331, 1333 (E.D. Pa.1971); 13 Pa.C.S.A. § 1103. Prior to the adoption of the Uniform Commercial Code, Pennsylvania enforced liquidated damage clauses that its courts labeled as nonpenal, but equitable considerations relating to the actual harm incurred were taken into account along with the difficulty of proving damages if a liquidated damage clause was rejected, e.g. *Emery v. Boyle*, 200 Pa. 249, 49 A. 779 (1901). We do not believe that the *U.C.C.* overrode this line of reasoning. Indeed, in a lower court case, decided after the *U.C.C.*'s enactment, it was stated that if liquidated damages appear unreasonable in light of the harm suffered, "the contractual provision will be voided as a penalty." *Unit Vending Corp. v. Tobin Enterprises*, 194 Pa.Super. 470, 473, 168 A.2d 750, 751 (1961). That case, however, is not on all fours with our case: *Unit Vending* involved an adhesion contract between parties of unequal bargaining power; the unfair contract was characterized by the court as "a clever attempt to secure both the penny and the cake" by the party with superior strength. *Id.* at 476, 168 A.2d at 753. Mechanically to read it as Pennsylvania law governing this case would be a mistake. The case, however, does show that Pennsylvania courts, like courts elsewhere, attempt to interpret the governing statute humanely and equitably.

The Restatement § 356 Comment b, after accepting anticipated damages as a measure, goes on to say that if the difficulty of proof of loss is slight, then actual damage may be the measure of reasonableness: "If, to take an extreme case, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable. See Illustration 4." Illustration 4 is a case of a contractor, A, agreeing to build B's race track by a specific date and to pay B $1,000 a day for every day's delay. A delays a month, but B does not get permission to operate the track for that month, so B suffers no loss. In that event, the Restatement characterizes the $1,000 per day as an unenforceable penalty. Sun contends that it is in the position of A: no actual loss was suffered by C and H because C and H had no tug to mate with the barge.

This argument restates in a new form Sun's basic contention that the liquidated damage clause was meant to operate only if the integrated tug barge was not delivered. The argument has been rejected by us as a misinterpretation of the contract. But in its new guise it gains appeal. If Illustration 4 is the present case, Sun is home scot-free. The Restatement, however, deals with a case where the defaulting contractor was alone in his default. We deal with a case of concurrent defaults. If we were to be so literal-minded as to follow the Restatement here, we would have to conclude that because both parties were in default, C and H suffered no damage until one party performed. Not until the barge was ready in March 1982 could C and H hold Halter for damages, and then only for the period after that date. The continued default of both parties would operate to take each of them off the hook. That cannot be the law.

Sun objects that Halter had a more absolute obligation to deliver than Sun did. Halter did not have to deliver the integrated tug, only the tug itself; it was not excused by Sun's default. Hence the spectacle of two defaulting contractors causing no damages would not be presented here. But Sun's objection does not meet the point that Halter's unexcused delivery would, on Sun's theory, have generated no damages. The tug by itself would have been no use to C and H.

■ We conclude, therefore, that in this case of concurrent causation each defaulting contractor is liable for the breach and for the substantial damages which the joint breach occasions. Sun is a substantial

cause of the damages flowing from the lack of the integrated tug; Sun cannot be absolved by the absence of the tug.

Sun has a final argument. Even on the assumption that it is liable as a substantial cause of the breach of contract, Sun contends that the actual damages suffered by C and H for lack of the integrated tug boat were slight. Actual damages were found by the district court to consist of "interest on progress payments, unfavorable terms of conversion to long-term financing, and additional labor expense." No dollar amount was determined by the district court in finding that these damages "bore a reasonable relationship to the amount liquidated in the Barge Contract."

The dollar value of the damages found by the district judge is, to judge from C and H's own computation, as follows:

| | |
|---|---|
| Additional Construction Interest | $1,486,000 |
| Added Payments to J.J. Henry | 161,000 |
| Added Vessel Operating Expenses | 73,000 |
| C and H Employee Costs | 109,000 |
| | $1,829,000 |

But "actual damages" have no meaning if the actual savings of C and H due to the nondelivery of the integrated tug barge are not subtracted. It was clearly erroneous for the district judge to exclude these savings from his finding. These savings, again according to C and H's own computation, were:

| | |
|---|---|
| Transportation savings | $525,000 |
| Lay-up Costs | $936,000 |
| | $1,461,000 |

The net actual damages suffered by C and H were $368,000. As a matter of law, Sun contends that the liquidated damages are unreasonably disproportionate to the net actual damages.

C and H urges on us the precedent of *Bellefonte Borough Authority v. Gateway Equipment & Supply Co.*, 442 Pa. 492, 277 A.2d 347 (1971), forfeiting a bid bond of $45,000 on the failure of a contractor to perform a municipal contract, even though the loss to the municipality was $1,000; the disproportion was 45 to 1. But that decision is not decisive here. It did not purport to apply the Uniform Commercial Code. Rules appropriate for bids to the government are sufficiently different from those applicable between private parties to prevent instant adoption of this precedent. A fuller look at relevant contract law is appropriate.

Litigation has blurred the line between a proper and a penal clause, and the distinction is "not an easy one to draw in practice." *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1290 (7th Cir.1985) (per Posner, J.). But the desire of courts to avoid the enforcement of penalties should not obscure common law principles followed in Pennsylvania. Contracts are contracts because they contain enforceable promises, and absent some overriding public policy, those promises are to be enforced. "Where each of the parties is content to take the risk of its turning out in a particular way" why should one "be released from the contract, if there were no misrepresentation or other want of fair dealing?" *Ashcom v. Smith*, 2 Pen. & W. 211, 218–219 (Pa. 1830) (per Gibson, C.J.). Promising to pay damages of a fixed amount, the parties normally have a much better sense of what damages can occur. Courts must be reluctant to override their judgment. Where damages are real but difficult to prove, injustice will be done the injured party if the court substitutes the requirements of judicial proof for the parties' own informed agreement as to what is a reasonable measure of damages. Pennsylvania acknowledges that a seller is bound to pay consequential damages if the seller had reason to know of the buyer's special circumstances. *Keystone Diesel Engine Co. v. Irwin*, 411 Pa. 222, 191 A.2d 376 (1963). The liquidated damage clause here functions in lieu of a court's determination of the consequential damages suffered by C and H.

These principles inform a leading common law case in the field, *Clydebank Engineering & Shipbuilding Co. v. Yzquierdo y Castaneda*, 1905 A.C. 6. The defendant shipyard had agreed to pay 500 pounds per week per vessel for delay in the delivery of four torpedo boat destroyers to the Spanish Navy in 1897. The shipyard pointed out

that had the destroyers been delivered on schedule they would have been sunk with the rest of the Spanish Navy by the Americans in 1898. The House of Lords found the defense unpersuasive. To prove damages the whole administration of the Spanish Navy would have had to have been investigated. The House of Lords refused to undertake such a difficult investigation when the parties had made an honest effort in advance to set in monetary terms what the lack of the destroyers would mean to Spain.

C and H is not the Spanish Navy, but the exact damages caused its manifold operations by lack of the integrated tug boat are equally difficult of ascertainment. C and H claimed that it suffered $3,732,000 in lost charter revenues. Testimony supported the claim, but the district court made no finding as to whether the claim was proved or unproved. The district court did find that the loss of charter revenues had not been anticipated by the parties. But that finding has no bearing on whether the loss occurred. Within the general risk of heavy losses forecast by both parties when they agreed to $17,000 per day damages, a particular type of loss was pointed to by C and H as having happened.

Proof of this loss is difficult—as difficult, perhaps, as proof of loss would have been if the sugar crop had been delivered late because shipping was missing. Whatever the loss, the parties had promised each other that $17,000 per day was a reasonable measure. The court must decline to substitute the requirements of judicial proof for the parties' own conclusion. The Moku Pahu, available on June 30, 1981, was a great prize, capable of multiple employments and enlarging the uses of the entire C and H fleet. When sophisticated parties with bargaining parity have agreed what lack of this prize would mean, and it is now difficult to measure what the lack did mean, the court will uphold the parties' bargain. C and H is entitled to keep the liquidated damages of $3,298,000 it has already received and to receive additional liquidated damages of $1,105,000 with in-

terest thereon, less setoffs determined by the district court.

On the comparatively minor issue as to whether C and H is entitled to arbitration of its claim for a contract price reduction, Article 32 of the contract provides for arbitration of all disputes arising out of the contract with exceptions not applicable here. But no dispute remains for arbitration. The district court found that Sun was excused from performing its mating obligations because the tug was not made available on March 11, 1982 when the barge was ready. C and H is not entitled to reimbursement from Sun for the costs it incurred in having the mating performed later by others. C and H was entitled to reimbursement for what it had paid Sun itself for the mating. But on the point system agreed to by the parties, this work represented 100 points out of possible 10,000 or 1 percent of the contract price. According to testimony offered on behalf of C and H, Sun credited C and H with a sum representing these 100 points. C and H's claim has been met. Arbitration is unnecessary.

■ Sun has counterclaimed against C and H and Halter for misrepresentation, charging that the two companies had concealed from Sun the true progress on the tug. The alleged damages consist in the expenses Sun incurred trying to meet its own contractual obligations to build the barge. This counterclaim lacks plausibility on its face. No damage is inflicted on a party which is induced to perform its own contract. The cases Sun invokes to support its position involve "active interference" by one party with another party's performance. They have no applicability here.

Uncontradicted testimony indicates, moreover, that Sun was aware of the delay. Employees of Sun were in touch with Halter. It would have been surprising if they had not been. Sun attempts to get around its actual knowledge by contending that it was not officially informed of the tug's progress. But the kind of knowledge that precludes the possibility of fraud does not

have to be officially conveyed. Sun's counterclaim is meritless.

AFFIRMED.