# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385

---

| | |
|---|---|
| Appellate Court Caption | INSUREONE INDEPENDENT INSURANCE AGENCY, LLC; AMERICAN AGENCIES GENERAL AGENCY, INC.; and AFFIRMATIVE INSURANCE HOLDINGS, INC., Plaintiffs-Appellants and Cross-Appellees, v. JAMES P. HALLBERG; WILLIAM J. HALLBERG; CASMIRA LENS, as Trustee of the James P. Hallberg 1994 Gift Trust; AND CASMIRA LENS, as Trustee of the Patricia L. Hallberg 1994 Gift Trust, Defendants-Appellees and Cross-Appellants. |
| District & No. | First District, Third Division<br>Docket Nos. 1-09-2385, 1-10-0428 cons. |
| Filed | June 27, 2012 |
| Rehearing denied | October 10, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Damages, plus fees and costs, were properly awarded to plaintiffs for defendants' violation of the noncompetition and nonsolicitation agreements in connection with plaintiff's purchase of several insurance companies from defendants, but where the record did not reveal a basis for the denial of plaintiff's request for prejudgment interest, the matter was remanded for further consideration; further, defendants lacked standing to recover on their counterclaim based on plaintiffs' failure to pay part of the purchase price plus conditional attorney fees related to two of the companies, because those companies were liquidated. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03-CH-20974; the Hon. Peter J. Flynn, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

Counsel on
Appeal

Pedersen & Houpt, of Chicago (Charles M. Gering, of counsel), for appellants.

Sullivan Hincks & Conway, of Oak Brook (Patrick Michael Hincks, Desmond Patrick Curran, Michael Anthony Faccenda, and Kevin O'Brien Gerow, of counsel), for appellees.

Panel

JUSTICE SALONE delivered the judgment of the court, with opinion. Presiding Justice Steele and Justice Murphy concurred in the judgment and opinion.

## OPINION

¶ 1 This is a consolidated appeal from a bench trial conducted in the circuit court of Cook County resolving disputes among the purchasers and sellers of the assets of several insurance companies.

¶ 2 Plaintiffs, InsureOne Independent Insurance Agency, LLC (New Insure One), American Agencies General Agency, Inc., and Affirmative Insurance Holdings, Inc. (Affirmative),[1] purchased the assets of several insurance companies owned or controlled by James P. Hallberg (Hallberg). The trial court entered judgment in favor of the purchasers on their claims that Hallberg, his nephew William Hallberg, and two gift trusts had violated noncompetition and nonsolicitation agreements, awarding the purchasers $7,670,210 in damages. The trial court also awarded the purchasers reasonable attorneys fees and costs associated with these claims. The court, however, declined to award prejudgment interest on this amount.

¶ 3 The trial court also entered judgment in favor of Hallberg on his counterclaim that the purchasers had not paid the full amount due on one component of the purchase price–known as the "contingent purchase price" (CPP)–awarding him $130,168 in damages plus prejudgment interest. The court also conditionally awarded Hallberg reasonable attorneys fees and costs in connection with this claim in the event that he can establish that his recovery exceeds five percent of the relevant component of the purchase price.

¶ 4 In case No. 1-09-2385, the purchasers now appeal from the trial court's decision awarding Hallberg damages on the counterclaim and conditional attorney fees. In addition, plaintiffs also contend that they should have been awarded prejudgment interest on their judgment against defendants for breaching the restrictive covenants. For the reasons that follow, we reverse the judgment of the circuit court on each of these issues. With respect

---

[1]The three purchasers will be collectively referred to as plaintiffs or purchasers.

solely to the issue of prejudgment interest on plaintiffs' award, we remand this cause to the circuit court for further proceedings.

¶ 5 In case No. 1-10-0428, defendant sellers have filed a separate appeal, which has been consolidated with that of the purchasers. The sellers appeal from the trial court's judgment in favor of the purchasers on their non-competition and nonsolicitation claims. For the reasons that follow, we affirm the judgment of the circuit court in all respects.

¶ 6                                    BACKGROUND

¶ 7 In January 2002, plaintiffs purchased from sellers the assets of several insurance companies that were owned or controlled by Hallberg.[2] These companies owned a book of nonstandard auto insurance.[3] The transaction was governed by a document titled "Asset Purchase Agreement" (APA) and dated January 7, 2002. Pursuant to section 8.1 of the APA, Hallberg agreed not to compete with the purchasers or solicit any of the purchasers' employees or customers for a period of five years.

¶ 8 The parties' plan was for Hallberg to run the resulting company. The purchasers hired Hallberg as the president of New Insure One pursuant to an employment agreement dated January 16, 2002. Pursuant to section 5.2 of this agreement, Hallberg promised not to compete with or solicit employees or customers of New Insure One both during the period of his employment as president of New Insure One, and for a period following termination of his employment of either one or three years, depending upon the circumstances of his termination. The purchasers retained many of the sellers' former employees, including Hallberg's nephew, William Hallberg, who signed a separate covenant not to compete with, or solicit employees of, New Insure One for 12 months following the termination of his employment.

¶ 9 However, soon after the transaction closed, Hallberg and the purchasers had several disagreements which made it impossible for them to work together. Hallberg and Affirmative's chief executive officer, Thomas Mangold, disagreed about many aspects of the new company's operations. Among other things, they disagreed about the role Hallberg would play, if any, in calculating that portion of the purchase price known as the "contingent purchase price" (CPP). The APA provided guidelines for the calculation and payment of the CPP, which was to be based on certain percentages of renewal business that New Insure One

---

[2]Sixteen related entities were involved on Hallberg's side of the transaction. For purposes of this appeal, however, only Hallberg, his nephew William Hallberg, and two gift trusts are involved. These entities will be referred to collectively as defendants or sellers.

[3]Testimony during trial established that "nonstandard" auto insurance refers to a segment of the automobile insurance market catering to insurance consumers who do not have evidence of prior insurance, who only purchase the minimum limits of coverage, who do not maintain their coverage in force, who live in high-crime areas and purchase minimum limits of liability because they do not have assets to protect, or who would not buy insurance absent mandatory insurance requirements.

carried over from Hallberg's former entities, and which was to be finalized more than a year after the closing.

¶ 10 Because of their disagreements over operating the new company, the parties decided that Hallberg would leave the company. In March 2003, the parties entered into a "Settlement Agreement and Mutual Release" (Settlement Agreement), which was to be effective as of May 7, 2003. The Settlement Agreement states that the parties are "desirous of reconfirming and clarifying the scope of the restrictive covenants contained in Section 5.2 of the Employment Agreement and Section 8.1 of the Asset Purchase Agreement." As stated, those restrictive covenants included Hallberg's noncompetition and nonsolicitation agreements. In August 2003, William Hallberg also left plaintiffs' employ and soon thereafter created the Hallberg Insurance Agency.

¶ 11 On December 16, 2005, plaintiffs filed suit against Hallberg and, *inter alia*, his nephew, William, and two gift trusts, alleging a number of claims, including breaches of the covenants not to compete and not to solicit employees which were contained in the APA and the employment agreements. Plaintiffs alleged that soon after Hallberg's departure from New Insure One, defendants set up the Hallberg Insurance Agency and other related entities which began competing directly with plaintiffs in their respective markets. Plaintiffs also alleged that Hallberg used the two gift trusts that he controlled to establish these competing businesses while attempting to mask his own involvement and avoid obvious violations of his noncompetition and nonsolicitation agreements. Plaintiffs contended that the trusts provided funding to these entities at interest rates significantly below market, and received funding through other Hallberg-controlled entities that could not compete directly with plaintiffs. Plaintiffs also alleged that other Hallberg entities provided office space and services to the competing businesses without any reimbursement. In addition, plaintiffs contended that defendants solicited plaintiffs' employees, recruiting them to work in their competing entities.

¶ 12 In response, Hallberg filed a verified answer, affirmative defenses and counterclaims to the pleading at issue here: the fifth amended verified complaint for injunctive relief and damages.[4] In his counterclaim, Hallberg alleged that plaintiffs materially breached the APA by failing to provide him with accountings and notices related to the CPP, and by failing to pay him the full amount of the CPP.

¶ 13 The trial court conducted a bench trial on all claims. The record reflects that this trial took place between August 2005 and March 2006, during which more than 20 witnesses testified, several hundred exhibits were offered, and a 3,500-page trial transcript was generated.

¶ 14 On January 20, 2009, the trial court entered a detailed, 31-page revised memorandum order and judgment, as well as an Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010)

---

[4]This pleading contained eight counts, five of which were dismissed at the close of plaintiffs' case and which are not at issue here. This appeal addresses only counts I (breach of contract by Hallberg), II (breach of covenant not to compete by the gift trusts) and IV (breach of contract by William Hallberg).

certification. In the order and judgment, the court found that: (1) Hallberg "intentionally violated APA Art. 8.1(ii) and Employment Agreement, Arts. 5.1 [and] 5.2(ii)"; (2) that "James Hallberg and William Hallberg, as well as others acting at James Hallberg's direction or suggestion, solicited and hired plaintiffs' employees"; and that (3) defendants "hired some 29 former employees of [plaintiffs], 15 before this suit was filed and 14 while this suit was pending."

¶ 15    The court further found that the evidence established that defendants were liable to plaintiffs for $7,670,210 in damages resulting from their breaches of the various noncompetition and nonsolicitation provisions at issue. The court also awarded plaintiffs their reasonable attorney fees and costs relating to these claims, but did not award them pre- or postjudgment interest.

¶ 16    With respect to Hallberg's counterclaim, the court entered judgment in Hallberg's favor on count I, which related to the purchasers' payment of the CPP. Noting that the CPP called for "complex calculations," the trial court held that plaintiffs underpaid Hallberg but determined that plaintiffs' miscalculation of this amount and their delay in making these calculations was not intentional. The court awarded Hallberg $130,168 on this claim, plus pre- and postjudgment interest. Further, the court found that Hallberg may be entitled to attorney fees if he ultimately shows that the purchasers underpaid the CPP in an amount exceeding 5% of the total amount of the CPP.

¶ 17    On February 19, 2009, the parties filed posttrial motions, each requesting that portions of the order and judgment be set aside. Plaintiffs requested that the court reconsider its rulings on Hallberg's CPP counterclaim, its award of pre- and postjudgment interest, and potential attorney fees to Hallberg, as well as its failure to award interest on plaintiff's judgment. The trial court revised the order and judgment to reduce the prejudgment interest award to Hallberg, and to award plaintiffs postjudgment interest. The court denied all other requests for posttrial relief.

¶ 18    Additional factual background will be provided in the course of the analysis set forth in the Discussion section.


¶ 19                                    DISCUSSION
¶ 20                          I. Appeal in Case No. 01-10-042
¶ 21    Defendants raise three general issues in their appeal. First, they contend that the trial court erred when it held that they were liable for violations of noncompetition and nonsolicitation clauses contained within the APA and the employment agreements. Second, defendants assert that the trial court erred when it found that plaintiffs' breaches of the APA were not material. Finally, defendants contend that the trial court erred in awarding damages to plaintiffs. For the following reasons, we reject defendants' contentions.


¶ 22                      A. Were Defendants Liable for Violation of the
                   Noncompetition and Nonsolicitation Provisions?
¶ 23    Pursuant to the provisions of the sale, Hallberg was bound by the noncompetition and

nonsolicitation covenants contained in section 8.1 of the APA. Section 8.1 states in relevant part:

"[E]ach seller covenants and agrees that, for a period ending on the fifth anniversary of the Closing Date ***, neither it or any of its affiliates will, directly or indirectly, whether as an employer, agent, independent contractor, officer, director, consultant, shareholder, partner, member or otherwise on behalf of any person:

* * *

(ii) undertake or carry on, or in any other manner advise or assist any person engaged or interested in, any business that is in any way involved in the production, sale or solicitation of any personal lines of insurance coverages or related items in any of the states listed in Schedule 8.1 (the Territory) or any other business that is in competition with the Business (it being understood by the parties hereto that the Business is not limited to any particular region of the Territory and that such business may be engaged in effectively from any location in the Territory); or

(iii) induce or attempt to persuade any employee or agent of the Business to terminate such employment, agency or business relationship in order to enter into any such relationship on behalf of any other business organization in competition with the business."

Hallberg was further bound by the terms of his employment agreement, which, in article 5.2, generally restates the restrictive covenants quoted above from section 8.1 of the APA.

¶ 24    William Hallberg was bound by his own separate employment agreement with plaintiffs, entitled "Covenant Not to Compete or Solicit Business," which states in pertinent part:

"For a period of twelve (12) months following his or her termination from the Companies, Employee will not, directly or indirectly:

* * *

Participate or be engaged in any manner, in the solicitation of, or acceptance of business from any policyholder for the purpose of producing or brokering, financing or offering any advice with respect to, any insurance products, with respect to any line, class or type of insurance, regardless of whether receiving compensation in connection therewith; or

Perform any act or make any statement which would tend to divert from the companies any trade or business with any customer *** to whom Employee previously sold insurance offered by or through the Companies; or

* * *

Induce or attempt to persuade any employee or agent of the companies to terminate such employment, agency or business relationship in order to enter into any such relationship on behalf of any other business organization in competition with the Companies."

¶ 25    The trial court found that despite these agreements, Hallberg, his nephew William, and the gift trusts engaged in a deliberate "pattern of conduct" designed to "recapture from the plaintiffs the very business [Hallberg] sold to them." The court determined that the evidence

established that Hallberg "plainly used the Gift Trusts to fund William Hallberg and others who he knew were competing with plaintiffs for business plaintiffs had acquired in the APA," and further found that Hallberg's "repeated denial that he controlled the Gift Trusts was completely without credibility; indeed, ultimately defendants acknowledged that [Hallberg] *did* control the Gift Trusts." (Emphasis in original.) The court explained:

"[T]he Gift Trusts were used precisely in order to mask Mr. Hallberg's involvement (though the masks were not very good). *** That happened in two ways: First, a manifestly Hallberg entity *** which could not itself fund businesses competing with plaintiffs, instead funded the Gift Trusts, which then funded the competing businesses. Second, the Gift Trusts themselves used other entities which the Gift Trusts control *** as vehicles for assisting businesses competing with plaintiffs (typically by providing office space, office resources, and personnel, rather than money, *per se*)."

¶ 26    The court held that throughout the trial, "[p]laintiffs established th[is] point again and again," and stated that "defendants' denials, in the face of the evidence, served to undercut their credibility." The trial court thus found that "Hallberg, with the knowing and active participation of William Hallberg and the Gift Trusts *** intentionally violated" APA article 8.1 and article 5.2 of the employment agreement by helping others to compete with plaintiffs.

¶ 27    With respect to the separate issue of whether defendants breached the covenants not to solicit and hire plaintiffs' employees, the trial court found that "James Hallberg and William Hallberg, as well as others acting at James Hallberg's direction or suggestion, solicited and hired plaintiffs' employees." This conclusion was based on the trial court's finding that William Hallberg created a new insurance agency–the Hallberg Insurance Agency–almost immediately after leaving plaintiffs' employ with a "conscious 'game plan' to identify and hire 'top producers' " from plaintiffs, on behalf of Hallberg-funded entities and "for the purpose of competing with plaintiffs." The court also noted the trial testimony of Anthony Strimel, a vice president of Hallberg Insurance Agency, who acknowledged that "by far the majority of agents at Hallberg Insurance Agency are former agents of InsureOne" and that they were persons "perceived to be top agents, high-quality people." The court found that the evidence established that defendants hired 29 former employees of plaintiffs, 15 before this suit was filed and 14 while the suit was pending.

¶ 28    In their appeal, defendants do not contest these findings of the trial court, including those regarding their intent. Instead, they generally contend that the trial court's judgment that they breached the restrictive covenants should be reversed because plaintiffs themselves breached the APA with respect to payments to be made to Hallberg under the CPP. Defendants point to the trial court's ruling on Hallberg's counterclaim that he was entitled to $130,168 from plaintiffs due to their miscalculation of the CPP, and argue that because plaintiffs themselves violated provisions of the APA with respect to the calculation and payment of the CPP, plaintiffs are barred from recovering for defendants' breaches of that same agreement. Defendants also contend that plaintiffs' breaches of the APA were material and that the trial court erred in holding otherwise. In addition, defendants also contend that they did not breach the nonsolicitation covenants; that they should not be held jointly and severally liable; and that the restrictive covenants were not enforceable. We reject each of defendants' contentions.

¶ 29     As an initial matter, we note that a trial court's holding that restrictive covenants are enforceable is reviewed *de novo*. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 63 (2006). However, a trial court's finding that parties have committed a breach of a restrictive covenant must be upheld unless it is against the manifest weight of the evidence. *Amalgamated Bank of Chicago v. Kalmus & Associates, Inc.*, 318 Ill. App. 3d 648, 655 (2000). A trial court's finding is against the manifest weight of the evidence only where the "opposite conclusion is clearly evident." *In re Estate of Wilson*, 238 Ill. 2d 519, 570 (2010). Thus, "[i]f the record contains any evidence to support the trial court's judgment, the judgment should be affirmed." *Id*. It is well settled that findings of the trial court "must be given deference because the trial court has the opportunity to view and evaluate witnesses' testimony and is, therefore, in the best position to evaluate their credibility." *Keel-Keef Enterprises, Inc. v. Quality Components Corp.*, 316 Ill. App. 3d 998, 1012 (2000).

¶ 30              1. *Strict v. Substantial Performance of Contract Terms*

¶ 31     Defendants contend that any breach they may have committed of the restrictive covenants contained within the APA is excused unless plaintiffs prove that their own performance was "in strict accordance" with the APA. Relying upon the 1958 decision in *Archibald v. Board of Education of City of Chicago*, 19 Ill. App. 2d 554, 561 (1958), defendants argue that if plaintiffs failed to perform *any* condition under the APA, no matter how small, they cannot recover for any breach of that agreement by defendants. Defendants are mistaken.

¶ 32     The concept relied upon by defendants that a contract plaintiff must prove his own literal or strict performance of the terms of the contract has long been repudiated by our courts. "Under the common law, one seeking recovery on a contract, had to prove literal performance of his promises in order to hold the opposite party to his promise to pay." (Internal quotation marks omitted.) *Watson Lumber Co. v. Mouser*, 30 Ill. App. 3d 100, 104 (1975). However, because this rule produced unduly harsh results, it was replaced by a new "rule in Equity, that if the [defendant] got substantially the thing for which he bargained," he would be held to his contractual obligations. (Internal quotation marks omitted.) *Id*.

¶ 33     Accordingly, a party suing for breach of contract need only allege and prove that "he has substantially complied with all the material terms of the agreement." *George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.*, 32 Ill. App. 3d 249, 254 (1975). Thus, "[a] partial breach by one party *** does not justify the other party's subsequent failure to perform; both parties may be guilty of breaches, each having a right to damages." (Internal quotation marks omitted.) *Israel v. National Canada Corp.*, 276 Ill. App. 3d 454, 460 (1995). Only a material breach of a contract provision will justify nonperformance by the other party. *Id*. at 461.

¶ 34     Accordingly, defendants' argument that plaintiffs must prove their own literal or strict performance of the terms of the APA is not supported by our case law.

¶ 35              2. *Was Plaintiffs' Breach of the CPP Material, Thereby Excusing Nonperformance of the Restrictive Covenants by Defendants?*

¶ 36     As stated, only a material breach of a contract provision will justify nonperformance by

the other party. *Id*. Defendants contend that plaintiffs' breach of provisions of the APA regarding calculation and payment of the CPP constituted a material breach of the APA which relieved defendants of performance of their restrictive covenants contained within that agreement. Defendants argue that although the trial court correctly held that plaintiffs breached these provisions, it erred in holding that the breach was immaterial. We disagree.

¶ 37 The trial court began its analysis of the CPP issue by setting forth the formula prescribed in the APA[5] to be used to compute this amount, and stating that it "called for complex calculations." The CPP was designed to reflect the sum of percentages of various commissions, unearned premiums and net written premiums realized by plaintiffs on various types of business during the first year following the sale. APA article 3.2(b) states that the parties had estimated the CPP at $5 million, and that amount was escrowed by plaintiffs at the time of sale. Article 3(c) of the APA instructs that interim payments were to be made from the escrowed funds on a monthly basis "to the extent that Contingent Purchase Price has actually been earned as of the month end preceding each such payment date." Finally, article 3(d) of the APA details the timing and manner of computing the final CPP amount, starting with an accounting by the plaintiffs within 90 days after the expiration of a year from the sale.

¶ 38 At trial, defendants argued that plaintiffs had intentionally mishandled the process of computing and paying the CPP. After considering evidence adduced by both parties, the trial court concluded that although "plaintiffs' conduct regarding the CPP was far from ideal," it rejected defendants' assertion that plaintiffs intentionally delayed payments and miscalculated amounts. The court explained that after "[h]aving heard the witnesses and reviewed the documents, this court finds that plaintiffs' shortcomings regarding the CPP resulted from the difficulty of the task itself–it involved 'an enormous amount of data,' [which] defendants concede." The court also noted that defendants' own expert, Lori Noll, "was not prepared to say that the time plaintiffs took [to calculate and pay] the CPP was manifestly unreasonable," and that she herself was unable to determine the accuracy of some of the calculations. After comparing the figures submitted by both plaintiffs and defendants,

---

[5]Pursuant to APA articles 1.1 and 3.2(a), the CPP was to be the sum of:

(i) 5% of the "unearned premium reserve of Galant [Insurance Co.] and Valor [Insurance Co.] computed as of 12.01 a.m. on January 1, 2002 in accordance with statutory accounting principles prescribed by the Illinois D[epartment] O[f] I[nsurance], consistently applied";

(ii) 5% of premiums "earned by [buyers] from an insured that was a customer of [sellers] at any time during the" year prior to the sale, but only "to the extent that such earned premium is actually received" within the year-plus-30-days after the sale;

(iii) 8.5% of "the aggregate net written premium (net of cancellations and return premiums) produced by [buyers] on renewal policies written within" a year after the sale "on policies placed with third-party insurance carriers" in defined lines; and

(iv) 40% of "net commissions (net of cancellations, return commissions and subproducer commissions) on written premiums produced by [buyers]" on renewal policies written within a year after the sale on life and health policies placed with third party insurance carriers.

the trial court concluded that plaintiffs had underpaid the CPP by $130,168.

¶ 39 The court then directly spoke to the issue of whether plaintiffs' breach of the APA with regard to handling the CPP payments was material and rejected defendants' argument that it was. The court provided three reasons in support of its conclusion that plaintiffs' breach was immaterial and that it did not entitle defendants to abandon the entire APA.

¶ 40 First, the court held that based upon APA article 3.2(d), "it is doubtful that the parties themselves considered a $130,168 difference even to be material–let alone a basis for scuttling the entire APA." The court noted that this provision of the APA provided that if defendants disputed plaintiffs' CPP calculation, they were to bear the cost of any resulting arbitration, "unless the Arbitrator's final determination of the [CPP] is more than 5% greater than" plaintiffs' calculation, "in which case [plaintiffs] shall bear such cost." Although this provision of the APA addressed a different matter, the court looked to the parties' use of a 5% trigger to shift costs as a general benchmark as to what they deemed to be a material deviation from the agreement.

¶ 41 Second, although the court found plaintiffs' delay in calculating the CPP to be "considerable," the court also found that "defendants have not established that it was so fundamental a breach as to warrant recision, or counter-breach by defendants," noting that during this litigation, "defendants did not take the position that plaintiffs should abandon the on-going CPP calculation, nor offer to refund the initial purchase price under the APA."

¶ 42 Finally, the trial court held that the case law did not support defendants' argument that under the circumstances either the delay or the less-than-5% dollar difference was so material and important to justify defendants in considering themselves relieved of the restrictive covenants. The court rejected what it termed to be defendants' "absolute view" and "drastic position."

¶ 43 As stated, only a material breach of a contract provision by one party will justify nonperformance by the other. *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 346 (2005). The test of whether a breach is "material" is whether it is "so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement." *Village of Fox Lake v. Aetna Casualty & Surety Co.*, 178 Ill. App. 3d 887, 900-01 (1989). "The breach must be so material and important to justify the injured party in regarding the whole transaction at an end." *Id*. at 901. The issue of whether a material breach of contract has been committed is a question of fact, and the trial court's judgment will not be disturbed unless it is against the manifest weight of the evidence. *Mohanty*, 225 Ill. 2d at 72.

¶ 44 We agree with the trial court that plaintiffs' breach of the APA provisions regarding the calculation and payment of the CPP was not material. The facts are undisputed that defendants sold their businesses to plaintiffs for approximately $16 million, with plaintiffs paying roughly $10 million at the time of sale and placing another $5 million in escrow to secure the CPP. The APA provided that plaintiffs were to make interim payments and ultimately complete all calculations and payments by April 1, 2003. However, plaintiffs were delayed in making the calculations and payments, to the extent that all payments under the

CPP were made by August 2004. The trial court, however, specifically found that this delay was attributable to the complexity of the task. "Under the law of Illinois, time requirements *** are by their nature accessory rather than central aspects of most contracts." (Internal quotation marks omitted.) *Chariot Holdings, Ltd. v. Eastmet Corp.*, 153 Ill. App. 3d 50, 58-59 (1987) (breach not material where "trial court properly focused *** on the complexity of the task to be performed"). Further, although plaintiffs underpaid the CPP by $130,168, this amount constitutes approximately 2% of the total CPP and less than 1% of the purchase price as a whole. The size of an underpayment relative to the total contract price is relevant in determining whether the underpayment constitutes a material breach. *Fox Lake*, 178 Ill. App. 3d at 900-01. Finally, the trial court also properly considered Hallberg's own unwillingness to rescind the APA, clearly showing that he did not consider plaintiffs' breaches to be so important as to justify him "in regarding the whole transaction as at an end." *Id*. at 901.

¶ 45    We agree with the trial court that under any reasonable reading of the APA, defendants got substantially what they bargained for under the agreement. Although the payments under the CPP were delayed and miscalculated, this was a function of the complex formula agreed to by both parties. Accordingly, the trial court's ruling that plaintiffs' breaches of the CPP were not material is not against the manifest weight of the evidence.

¶ 46            *3. Defendants' Breach of the Nonsolicitation Covenants*

¶ 47    Defendants next contend that the trial court erred in holding that they breached their covenants not to solicit plaintiffs' employees. The trial court found that defendants acted in concert to breach their contractual duties by directly and indirectly "inducing or attempting to persuade" plaintiffs' employees to terminate their employment. Defendants premise their argument upon a ruling made by the trial court earlier in the case, as well as upon a stipulation entered into between the parties.

¶ 48    At the close of plaintiffs' evidence at trial, defendants–pursuant to section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2004)) filed a motion requesting the trial court to find in their favor on count IV of plaintiffs' fifth amended verified complaint, which alleged that defendants had committed tortious interference with plaintiffs' prospective economic advantage. The trial court granted this motion and dismissed this count.

¶ 49    In support of their claim of error, defendants also point to a stipulation entered into between the parties that the former employees, if called, would testify that neither Hallberg nor his nephew personally "induced or attempted to persuade" them to terminate their employment with plaintiffs.

¶ 50    Defendants now assert that the trial court's ultimate ruling finding that defendants breached their nonsolicitation agreements is in conflict with this earlier one. We reject defendants' assertion that the trial court's prior ruling on count IV, combined with the stipulation, leads to the conclusion that the trial court erred.

¶ 51    In ruling on defendants' motion for judgment on count IV at the close of plaintiffs' proof at trial, the court explained:

> "The difficulty here is that while the evidence leaves me with not a great deal of doubt that the defendants collectively were prepared to skate as close to the line as they

could, there is a dearth of proof specific to any of the defendants. Let me focus in that regard on William Hallberg. Mr. William Hallberg, if we look at this solely from the standpoint of tortious interference *** [he] ended up with a bunch of former InsureOne employees. I am asked to infer that because there were so many of them, he must have solicited them. *** [I]t might be a persuasive notion if Mr. William Hallberg were the only defendant, the only person involved in this entire scenario from the defendants' side of things; I think it fails when you consider that he wasn't the only person involved."

¶ 52    The court's prior ruling shows that it found a lack of evidence that either Hallberg or his nephew had personally and individually solicited plaintiffs' employees to support plaintiffs' tort claim. Defendants fail to note, however, that in the same ruling the court denied their section 2-1110 motions to dismiss counts I and V, which stated the claims for breach of contract related to these hirings and upon which the court ultimately entered judgment against them. At that time, the trial court drew a distinction between the dismissed tort claim in count IV and the breach of contract claims in counts I and V, making it clear that the restrictive covenants were "not solely limited to the solicitation of employees," as their language was "somewhat broader." The court then held that "plaintiffs have presented a *prima facie"* case regarding those covenants.

¶ 53    As noted, the restrictive covenants forbid defendants from "directly or indirectly *** induc[ing] or attempt[ing] to persuade any employee or agent *** to terminate such employment, agency or business relationship in order to enter into any such relationship on behalf of any other business organization in competition." Therefore, the fact that the court dismissed the tortious interference claim in count IV on the basis that defendants did not personally solicit the employees does not mean–as defendants now suggest–that they also did not breach the broader duties under the restrictive covenants by "directly or indirectly inducing or attempting to persuade" plaintiffs' employees to leave. Thus, contrary to the argument advanced by defendants, the trial court's findings in dismissing count IV did not obligate it to reject counts I and V as well.

¶ 54    As noted, the trial court found that the evidence established that defendants, in concert, deliberately targeted, solicited and hired plaintiffs' employees as part of a "conscious 'game plan' to identify and hire 'top producers' " from plaintiffs "for the purpose of competing with plaintiffs." The trial court further found that given the "number and timing of defendants' hirings"–specifically, that defendants hired 29 former employees of plaintiffs–that their later denials were "not credible."

¶ 55    Accordingly, we conclude that there was ample evidentiary support for the trial court's finding that defendants breached the covenants prohibiting solicitation of plaintiffs' employees, and, therefore, the court's ruling was not against the manifest weight of the evidence.

¶ 56                    4. *Defendants' Joint and Several Liability*

¶ 57    Defendants next contend that the trial court erred in making them jointly and severally liable for violating the restrictive covenants. We disagree.

¶ 58    The trial court's order and judgment reveals that the court imposed joint and several

liability on defendants based upon their concurrent breaches of the restrictive covenants. The trial court explained:

> "James Hallberg, with the knowing and active participation of William Hallberg and the Gift Trusts *** intentionally violated [the restrictive covenants]. ***
>
> * * *
>
> Given the pattern of conduct described above, the court *** rejects defendants' argument that the resulting damages must be separately (and somewhat artificially, under the circumstances) parsed out defendant by defendant. As defendants assert *** in general 'defendants who have separate and distinct contracts with a common entity cannot be subject to joint liability for breach of contract.' But here, the pertinent defendants–James Hallberg, William Hallberg and the Gift Trusts–were hardly 'separate and distinct' from one from another, *vis-a-vis* plaintiffs in more than a technical sense. It was obvious from the outset, and all of them knew, that plaintiffs intended (and defendants agreed) that James Hallberg would not be able to do indirectly what he had promised not to do directly. Nor was those defendants' conduct independent one from another in that regard. It was rather a synergy, and consciously so designed. Thus, this case does not at all resemble *Mercantile Holdings, Inc. v. Keeshin*, 187 Ill. App. 3d 1088, 1094-95 (1989), cited by defendants.
>
> * * *
>
> *** [T]he court declines to engage in what on this record would be an artificial allocation of *** damages between the four defendants, all of whom acted together to bring about the damages."

¶ 59 In support of their contention of error, defendants largely rely on *Mercantile Holdings, Inc. v. Keeshin*, 187 Ill. App. 3d 1088, 1094-95 (1989), a case discussed and rejected by the trial court as factually inapposite. We agree. Defendants make citation to *Mercantile* for the proposition that "multiple defendants sued for breach of contract cannot be subject to joint and several liability where their duties arise out of separate contracts with separate terms, even if they were working together or assisting each other." *Mercantile*, however, neither stands for this proposition nor is it factually analogous to this case. Rather, *Mercantile* holds that under the law of suretyship, a debtor who contracts with a third party for the assumption of his debt is jointly and severally liable with the third party to his creditor, whereas a third party who assumes a debt by contracting directly with the creditor becomes primarily liable. *Mercantile*, 187 Ill. App. 3d at 1093-94.

¶ 60 Plaintiffs direct us to cases from other jurisdictions which have adopted the doctrine of concurrent breach of contract under similar facts. We find these cases persuasive under the unique factual circumstances presented in this matter.

¶ 61 Under the doctrine of concurrent breach of contract, "[w]here A and B owe contract duties to C under separate contracts, and each breaches independently, and it is not reasonably possible to make a division of the damage caused by the separate breaches closely related in point of time, the breaching parties, even though they acted independently, are jointly and severally liable." *Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn. 1983). In other words, "[w]hen two defendants independently breach separate contracts, and it is not

-13-

'reasonably possible' to segregate the damages, the defendants are jointly and severally liable." *Domtar, Inc. v. Niagara Fire Insurance Co.*, 563 N.W.2d 724, 740 (Minn. 1997); see also *California & Hawaiian Sugar Co. v. Sun Ship, Inc.*, 794 F.2d 1433, 1437 (9th Cir. 1986) ("in this case of concurrent causation each defaulting contractor is liable for the breach and for the substantial damages which the joint breach occasions").

¶ 62    Defendants do not contest the trial court's finding that their conduct in violating the restrictive covenants was concurrent and coordinated. Under these specific facts, we hold that the trial court did not err in imposing joint and several liability upon defendants.

¶ 63            5. *Enforceability of William Hallberg's Covenant Not to Compete*

¶ 64    Defendants next contend that the trial court erred in finding that William Hallberg's noncompetition covenant was enforceable. According to defendants, a fatal flaw in plaintiffs' case was their failure to establish a legitimate business interest which needed to be protected by the time, area and activity restraints contained within the covenant. Defendants point to the trial court's finding that there was no evidence of long-standing permanent customer relationships in the substandard insurance market to support their contention that plaintiffs had no legitimate business interest in restricting William Hallberg's competition. We reject defendants' argument.

¶ 65    Our supreme court recently rendered an opinion which generally addressed breaches of noncompetition restrictive covenants and specifically clarified the weight to be given to the factor of legitimate business interest as part of that analysis. In *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, the court held that the legitimate business interest test is to "be employed as part of the three-prong rule of reason to determine the enforceability of a restrictive covenant not to compete." *Id.* ¶ 43. The court explained:

> "[W]hether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case. Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions. No factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case." *Id.*

¶ 66    Our supreme court's decision in *Reliable* makes it clear that defendants are incorrect in asserting that the legitimate business interest test is determinative in deciding whether a restrictive covenant is enforceable. Rather, " '[e]ach case must be determined on its own particular facts' " and " '[r]easonableness is gauged not just by some but by *all* of the circumstances,' " which means that " '[t]he same identical contract and restraint may be reasonable and valid under one set of circumstances, and unreasonable and invalid under another set of circumstances.' " (Emphasis in original.) *Id.* ¶ 42 (quoting *Arthur Murray Dance Studios of Cleveland, Inc. v. Witter*, 105 N.E.2d 685, 692-93 (Ohio Ct. Com. Pl. 1952)).

¶ 67    Thus, although the trial court declined to find that the nonstandard auto insurance industry is dominated by "near permanent" customer relationships, that is not the only factor to be considered in determining whether a restrictive covenant is enforceable. As noted, the

trial court found that William Hallberg played a pivotal role in defendants' concerted and "conscious 'game plan' to identify and hire 'top producers' " from plaintiff. As part of this plan, the court also found that William obtained plaintiffs' sales production report shortly after he left plaintiffs' employ, "thus giving him precise information about plaintiffs' sales agents' production numbers." In addition, the court specifically found that William's noncompetition agreement "was neither facially overbroad nor lacking in consideration." Based upon the totality of the evidence presented at trial, we conclude that the trial court did not err in ruling that William Hallberg's restrictive covenant was enforceable.

¶ 68    6. *Enforceability of the Covenants Not to Compete*
*Against Hallberg and the Gift Trusts*

¶ 69    Defendants next assert that the trial court also erred in holding that the restrictive covenants were enforceable against Hallberg and the gift trusts on the basis that there was inadequate evidence presented to support their validity. Defendants contend that rather than analyze the enforceability of the covenants, the trial court "simply assumed that these noncompetes were enforceable based solely on their presence in an agreement for the sale of a business." We disagree.

¶ 70    Restrictive covenants and noncompetition agreements are evaluated differently depending upon whether they derive from an employment relationship or are ancillary to the sale of a business. "Courts impose a less stringent test of reasonableness on covenants ancillary to the sale of a business than on those in employment contracts because of the difference in the nature of the interests protected." *Health Professionals, Ltd. v. Johnson*, 339 Ill. App. 3d 1021, 1031 (2003) (citing *Central Water Works Supply, Inc. v. Fisher*, 240 Ill. App. 3d 952, 956 (1993)). A noncompetition agreement ancillary to the sale of a business "protects the good will purchased by the buyer, ensuring that 'the former owner will not walk away from the sale with the company's customers and good will, leaving the buyer with an acquisition that turns out only to be chimerical.' " *Id*. at 1031 (quoting *Central Water Works Supply, Inc.*, 240 Ill. App. 3d at 957). Goodwill is the "advantages a business has over competitors as a result of its name, location and reputation. It is a sufficient interest to justify a restrictive covenant and the protection of injunctive relief." *Health Professionals, Ltd. v. Johnson*, 339 Ill. App. 3d 1021, 1032 (2003). The enforceability of a noncompetition agreement ancillary to a sale of a business depends on the reasonableness of its terms. The restrictions imposed, in terms of time, geographical scope and activity, must not be greater than necessary to protect the buyer, and the agreement must not be oppressive to the seller or injurious to the general public. *Id*.

¶ 71    As stated, the trial court found that Hallberg funded three competing insurance agencies by funneling nearly $7 million through the gift trusts in a failed attempt to "mask" his involvement in an intentional effort to "recapture from plaintiffs the very business he sold to them." The court further found that other Hallberg-controlled corporate entities provided the competing agencies with free office space, office resources and personnel, and that they targeted plaintiffs' businesses by opening in close proximity to plaintiffs' retail locations, which was found to be "neither an accident nor a coincidence."

¶ 72    Hallberg does not dispute these finding of fact. Rather, he contends that his activities were "not related to the solicitation or sale of personal lines of insurance" and that the restrictive covenants are enforceable only to the extent that they prevent him from "using his expertise" to compete with plaintiffs. Hallberg reads the provisions of the covenants far too narrowly.

¶ 73    Our careful review of the record leads us to conclude that the trial court did not err in finding that Hallberg's activities were competitive with those of plaintiffs and that there is no support for defendants' assertion that Hallberg's activities were "completely unrelated" to plaintiffs' businesses. Hallberg, through the gift trusts, funded the competing businesses and also provided services to those businesses for free. In addition, the record supports the trial court's judgment, in that the time, geographic scope and activity limitations contained within the restrictive covenants were reasonable, protected plaintiffs' goodwill, were not oppressive to defendants, and were not injurious to the public. Accordingly, the trial court did not err in holding that the restrictive covenants were enforceable against Hallberg and the gift trusts.

¶ 74                              B. Damages Awarded to Plaintiffs

¶ 75    Defendants also contend that the damages awarded to plaintiffs by the trial court for defendants' breaches of the restrictive covenants are unsupported by the evidence presented at trial and are "unreasonable" and "absurd." We disagree.

¶ 76    The trial court heard testimony from experts hired by both parties: Lawrence Levine testified as an expert on behalf of plaintiffs, and John Bone testified as an expert on behalf of defendants. The trial court noted in its order and judgment that "it is, understandably, more than usually difficult for plaintiffs to establish actual loss or measurable damages" based upon the type of businesses involved, *i.e.,* competing entities in the substandard automobile insurance market. Therefore, the court observed, "both plaintiffs' and defendants' experts approached damages through a combination of modeling and revenue cash flow analysis."

¶ 77    Plaintiff's expert Levine predicted the total gross premiums of the three competing agencies and multiplied that total by plaintiffs' profit margin for its organization. Levine's model also included "head start" damages which extended beyond the term of the restrictive covenants to reflect the ongoing loss arising from defendants' early entry into the market.

¶ 78    Defendants' expert Bone criticized various aspects of Levine's model, and the trial court adopted two of these criticisms in its analysis: (1) the trial court agreed with Bone's reduction of the "head start" damages; and (2) the trial court adopted Bone's criticism of Levine's assumption that every customer gained by defendants was one lost to plaintiffs. This caused the trial court to reduce Levine's calculation of total damages to $5,307,400.

¶ 79    The trial court also rejected some of Bone's analysis. The court did not agree with Bone's assumption that plaintiffs competed equally with every insurance agency in the relevant states, no matter the distance from plaintiffs. The trial court also found that Bone failed to account for the local nature of the nonstandard auto insurance industry, defendants' deliberate proximity to plaintiffs' stores, and the competitiveness of other agencies. The

evidence at trial also showed that Levine's model–which he prepared in 2004–underpredicted defendants' success. Using the actual numbers available from 2006, Levine established that defendants' actual gross premiums were, in fact, two to three times greater than he had predicted.

¶ 80    The trial court thus concluded that "the truth lies somewhere between the respective testimony of the parties' expert witnesses." It then went on to explain:

> "Levine's $5,307,400 is a proper starting point. It must be adjusted upward, however, given (i) Bone's admission that Levine severely underpredicted defendants' profits (which Bone projected at $18.24 million during the noncompete period ***) and (ii) Levine's testimony that his model underpredicted *** revenues [of one of defendants' companies] by some 37% in 2004 (actual $9.1 million vs. predicted $3.4 million) and by over 50% in 2005 ($17.7 million actual, based on annualizing Bone's partial-year numbers vs. $7.8 million predicted). *** The court concludes that Levine's $5,307,400 should be increased by 40%, to $7,430,360 to remedy the underprojection while not unduly assuming that all of defendants' success came at plaintiffs' expense.

> On the other hand, the court concludes that Mr. Levine's additional $369,000 solicitation of employees damage calculation must be reduced to account for the likelihood that some of the departing employees would have left anyway. *** In the court's view, a 35% reduction in this component, to $239,850, is appropriate. The aggregate damages award is therefore $7,670,210. The court concludes that that award fairly compensates plaintiffs, as well as can reliably be estimated on the record herein, without inappropriately penalizing defendants."

¶ 81    A reviewing court will not disturb an assessment of damages made by a trial court sitting without a jury unless that award is manifestly erroneous. *Lynch v. Precision Machine Shop, Ltd.*, 93 Ill. 2d 266, 278 (1982). As stated, a trial court's finding is against the manifest weight of the evidence only where the "opposite conclusion is clearly evident." *In re Estate of Wilson*, 238 Ill. 2d 519, 570 (2010). Thus, "[i]f the record contains any evidence to support the trial court's judgment, the judgment should be affirmed." *Id.*

¶ 82    The basic theory of damages for breach of contract is that the plaintiff must establish an actual loss or measurable damages resulting from the breach in order to recover. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 149 (2005). In a breach of contract action, "the proper measure of damages is the amount of money that will place the injured party in as satisfactory a position as he or she would have been in had the contract been performed. [Citation.] Loss of profits may be recovered if the plaintiff proves the loss with a reasonable degree of certainty, if defendant's wrongful act resulted in the loss, and if the profits were reasonably within the contemplation of defendant at the time the contract was entered into." *Equity Insurance Managers of Illinois, LLC v. McNichols*, 324 Ill. App. 3d 830, 837 (2001). Where a claim of lost profits arises from a breach of contract, it is "customarily not susceptible of detailed or direct proof, and that unless proof of an inferential character is permitted, the result would be to immunize a defendant from the consequences of his wrongful acts." *Vendo Co. v. Stoner*, 58 Ill. 2d 289, 310 (1974). Because lost profits are, to some extent, "uncertain and incapable of calculation with mathematical precision,"

a recovery may be had for such profits "when there are any criteria by which the probable profits can be estimated with reasonable certainty." (Internal quotation marks omitted.) *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 315-16 (1987).

¶ 83    In the matter at bar, it is undisputed that plaintiffs suffered an injury. As the trial court found in its order and judgment, "[t]he fact of injury is not in doubt; even defendant's expert, Mr. Bone, acknowledged that some injury occurred." Defendants assert, however, that plaintiffs failed to adduce proof that any losses they incurred were traceable to defendants' breaches of the restrictive covenants. They contend that plaintiffs' evidence that the number of potential customers entering its stores declined after defendants opened their competing agencies despite increasing advertising by 35% was insufficient. We disagree. Plaintiffs did not allege that each lost quote opportunity would have resulted in a sale. Rather, plaintiffs' evidence of the sales made by defendants' competing agencies led to a reasonable inference that plaintiffs would have made a portion of these sales absent defendants' competition, especially in light of the uncontradicted evidence that defendants opened stores in close proximity to plaintiffs' in an effort to target their customers.

¶ 84    Defendants also contend that the trial court erroneously awarded damages beyond the term of the restrictive covenants to account for the "head start" defendants acquired by opening their competing agencies early. The court explained this damages component as follows:

> "[H]aving started sooner (gotten a 'head start'), [defendants are now] in a better position to continue competing because [they] have already–and too soon–gotten past [their] post-noncompete 'ramp up.' Levine's 'head start effect' is an attempt to quantify that improper post-noncompete-expiration advantage. In that regard, it also takes into account plaintiffs' loss of a bargained-for side benefit of a noncompete–the lessening of defendants' ability to compete, after the restriction expires, simply due to the passage of time."

Defendants' own expert, Bone, did not dispute that such damages occurred, although he recommended that the amount calculated by Levine be reduced–a recommendation which the trial court adopted.

¶ 85    Although defendants make citation to two cases in support of their argument that, as a matter of law, damages cannot be awarded for time periods outside of those governed by the restrictive covenants, the decisions relied upon are factually inapposite. Neither *Royal's Reconditioning Corp. v. Royal*, 293 Ill. App. 3d 1019 (1997), nor *Feldstein v. Guinan*, 148 Ill. App. 3d 610 (1986), involved restrictive covenants ancillary to the sale of a business; instead, both involved breach of employment contracts. In *Royal's*, an employee breached a provision which required 30 days' notice of resignation. Because the employer had no legitimate expectation of the services of the employee beyond the 30-day period, its lost profits were limited to that period. *Royal's*, 293 Ill. App. 3d at 1024. In *Feldstein*, an employer wrongfully discharged an employee prior to his contractually guaranteed one-year term of employment. The court found that because the employee had no expectation of employment beyond that term, he was limited to recovering the wages he would have earned during that term had he not been discharged. *Feldstein*, 148 Ill. App. 3d at 613.

¶ 86    In contrast, pursuant to the provisions of the restrictive covenants, plaintiffs had a legitimate expectation that defendants could not even begin to form competing businesses until the expiration of those agreements. That expectation, however, was defeated due to defendants' running of competing businesses prior to the expiration of the covenants. Although this type of harm is usually addressed through injunctive relief that would extend during the covenant's term, the trial court declined to order equitable relief because it found that plaintiffs could be adequately compensated with monetary damages.

¶ 87    Defendants also contend that plaintiffs had a duty to mitigate their damages by doing business with defendants, *i.e.*, allowing defendants to write plaintiffs' policies. We reject defendants' contentions. Under the duty to mitigate, an injured party need only avoid those damages he can "without undue risk, burden, or humiliation." *East St. Louis School District No. 189 v. Hayes*, 237 Ill. App. 3d 638, 644 (1992). Defendants contend that "the record clearly shows that [defendants'] competing agencies each attempted to sell [plaintiffs] insurance but [plaintiffs] refused to let the competing agencies write their insurance, even going so far as to cancel previously-existing relationships." However, an injured party is not required to accept performance from a breaching party on new or modified terms. *American Fidelity Fire Insurance Co. v. General Ry. Signal Co.*, 184 Ill. App. 3d 601, 614-15 (1989). After defendants intentionally violated the provisions of the restrictive covenants, it would be unreasonable to expect plaintiffs to renew business relationships with them without taking an "undue risk" that they would not honor their agreements.

¶ 88    In addition, defendants assert that the trial court erred because the damages it awarded "were not reasonably within the contemplation of the parties." Defendants maintain that they were unaware that if they breached their restrictive employment covenants, plaintiffs would suffer lost profits. The trial court found that "it was certainly foreseeable that defendants' conduct would cost plaintiffs business and profits." We agree.

¶ 89    "[A]ll damages which naturally and generally result from a breach are recoverable; it is only where damages are the consequence of special or unusual circumstances that it must be shown that the damages were within the reasonable contemplation of the parties." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 318 (1987). Defendants offer nothing to suggest that they were unaware that if they breached their restrictive covenants, plaintiffs would experience lost profits–the type of damages which would "naturally and generally result" from their breaches.

¶ 90    Defendants also contend that the trial court's damage award punished defendants rather than provided reasonable compensation to plaintiffs. We disagree. The record reflects that the trial court did not take either experts' figures at face value and, instead, adjusted them based upon the evidence presented. Thus, there is no support for defendants' contention.

¶ 91    In sum, the evidence was sufficient to provide a legal basis for the damages award made by the trial court. We find no error.


¶ 92            C. Conclusion as to Appeal in Case No. 01-10-0428

¶ 93    With respect to the appeal brought by defendants in case No. 01-10-0428, we reject each argument raised by defendants and affirm the judgment of the trial court in all respects.

¶ 94                     II. Appeals in Case No. 01-09-2385

¶ 95        We now turn to the issues raised by plaintiffs in their appeal in case No. 01-09-2385. Plaintiffs raise four claims of error: (1) the trial court erroneously determined that Hallberg was entitled to a judgment of $130,168 on his counterclaim regarding the CPP, even though the APA clearly indicated that he personally was not entitled to receive payment of that portion of the purchase price; (2) the trial court incorrectly determined that Hallberg was entitled to statutory interest based on the timing of the purchasers' payment of the CPP; (3) the trial court erred in awarding Hallberg conditional attorney fees and costs incurred in pursuing his CPP counterclaim; and (4) the trial court incorrectly failed to award plaintiffs statutory prejudgment interest for the period of time from the court's initial award in favor of plaintiffs to the date of final judgment.

¶ 96            A. The Trial Court's Award of $138,168 to James P. Hallberg
                on His Counterclaim Regarding the Contingent Purchase Price

¶ 97                1. *Is Hallberg Entitled to Recover Any Amount Relating*
                        *to the Contingent Purchase Price?*

¶ 98        Article 3.3 of the APA provides that the CPP "shall be allocated in a manner consistent with the allocations set forth in Schedule 3.3." In turn, schedule 3.3 states that the CPP "shall be allocated to Gallant/Valor [Insurance Companies] pro rata in accordance with their respective allocations indicated [in the schedule]." The record also reflects that on February 25, 2002, the Illinois Director of Insurance obtained an order of conservation over Gallant and Valor, the two entities to which the CPP payments were to be made. Pursuant to the conservation order, the Director of Insurance took possession and control of the property, books, records, accounts, assets, business and affairs of Gallant and Valor. On August 9, 2002, orders of liquidation were entered against Gallant and Valor, effective August 23, 2002. As of that date, all legal control of Gallant and Valor was vested in the Office of the Special Deputy Receiver of the Illinois Department of Insurance (OSD), and the OSD acquired title to all rights of action belonging to Gallant and Valor, including their rights to collect the CPP. Subsequent to the entry of the orders of liquidation, plaintiffs sent the payments due under the CPP to the OSD, on behalf of Gallant and Valor.

¶ 99        In its order and judgment, the trial court found that APA article 3.3 and schedule 3.3 "plainly specify that the [CPP] shall be allocated to Gallant/Valor pro rata," and noted that since "both Gallant and Valor were in conservation and, later, liquidation proceedings *** monies due them under the APA were properly under the control of the Director of Insurance." Nevertheless, upon finding that plaintiffs had underpaid the CPP by $130,168, the trial court held that award "will be treated as properly payable to defendants in the first instance." In a footnote, the court stated that "OSD is not a party to this action, and the court declines to volunteer a view at this juncture as to how the $130,168 or interest amounts should ultimately be allocated as between defendants and OSD."

¶ 100       Plaintiffs now contend that the trial court erred in awarding the CPP underpayment directly to Hallberg, when the APA provided that only Gallant and Valor are entitled to such recovery. Under these circumstances, plaintiffs allege that this portion of the circuit court's

judgment in Hallberg's favor is unsupportable and must be reversed. We agree.

¶ 101　　A trial court interprets the meaning of clear and unambiguous contract terms as a matter of law, and its interpretation is subject to *de novo* review. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007). Contracts must be interpreted based on the intent of the parties when the contract was formed. *Id*. at 232. Where the terms of a contract are clear, the court applies the contract as written, giving effect to the contract's terms based on the ordinary and natural meaning of the contract language. *Id*. at 233.

¶ 102　　As stated, the trial court found that "APA Art. 3.3 and Schedule 3.3 plainly specify that the 'Contingent Purchase Price' shall be allocated to Gallant/Valor pro rata" and concluded that the "payment of the CPP to Gallant/Valor/OSD was proper [and] was specifically intended *** by APA Art 3.3 and Schedule 3.3." Nowhere within the APA is it provided that Hallberg was to directly receive any portion of the CPP payments. Accordingly, under the plain language of the agreement, only Gallant and Valor were entitled to the CPP payments under the APA. Therefore, there was no basis for the trial court to enter judgment in Hallberg's favor in connection with payments made pursuant to the CPP. To the extent that the purchasers underpaid the CPP, any claims relating to that alleged underpayment belonged solely to Gallant and Valor, and, by virtue of the order of liquidation, to the OSD.

¶ 103　　Because no provision of the APA entitled Hallberg to receive payments under the CPP, plaintiffs further contend that Hallberg lacked standing to assert any claim for recovery of those amounts. We agree. To establish standing, a claimant must demonstrate the existence of an actual or threatened injury in fact to a legally cognizable interest belonging to the claimant. *Amtech Systems Corp. v. Illinois State Toll Highway Authority*, 264 Ill. App. 3d 1095, 1103 (1994). As stated, Gallant and Valor are the only promisees with respect to the CPP under the terms of the APA. Consequently, Gallant and Valor are the only parties with standing to sue for payments of the CPP. The trial court provided no explanation as to why Hallberg was entitled to recover any shortfall in the CPP payments despite the clear language of the APA requiring such payments to be made to Gallant and Valor. The court's award of the additional CPP payments to Hallberg was inconsistent with its finding that the parties to the APA specifically intended that the CPP would be paid to Gallant and Valor, and, later, to the OSD.

¶ 104　　Because Hallberg lacked standing to pursue his claim with respect to CPP payments, the trial court erred in granting judgment in his favor on that claim. Accordingly, we reverse the trial court's judgment.

¶ 105　　　　　　*2. Was Hallberg Entitled to Statutory Prejudgment Interest?*

¶ 106　　Plaintiffs next allege that the trial court erred in awarding Hallberg prejudgment interest pursuant to section 2 of the Interest Act (815 ILCS 205/2 (West 2004)) on: (1) the $130,168 underpayment of the CPP; and (2) on approximately $800,000 of CPP payments which the court found that plaintiffs had paid late due to delays in their CPP calculations.

¶ 107　　Plaintiffs contend that because Hallberg is not entitled to receive any CPP payments under the provisions of the APA, he similarly cannot recover interest relating to the late payment of such amounts. We agree.

¶ 108    Having just determined that the trial court erred in granting judgment to Hallberg on his claim regarding CPP payments, we therefore also hold that the trial court's award of prejudgment interest on those amounts is error. We therefore reverse the judgment of the trial court with regard to the award of prejudgment interest on this claim.

¶ 109                      3. *Was Hallberg Entitled to Attorney Fees and Costs?*

¶ 110    Article 8.1 of the APA contains that agreement's only provision for the payment of attorneys fees in court proceedings. Article 8.1 expressly applies to claims relating to the sellers' noncompetition and nonsolicitation agreements and provides that "[t]he prevailing party in any action commenced under this section 8.1 shall also be entitled to receive reasonable attorneys fees and costs." In other words, the attorney fee petition in article 8.1 is expressly limited to claims relating to the restrictive covenants.

¶ 111    Hallberg's counterclaim, however, relates solely to the purchasers' payment of the CPP. Noting this, the trial court held that article 3.2(d) of the APA provided a basis for its conditional award of attorney fees to Hallberg. Although article 3.2(d) relates to calculation and payment of the CPP, it specifically speaks to the parties' responsibility for costs paid to an arbitrator in an arbitration relating to a dispute concerning the CPP:

> "The cost of retaining an arbitrator shall be borne by Sellers, unless the Arbitrator's final determination of the [CPP] is more than five percent (5%) greater than the [CPP] Payment computed by purchaser in the preceding paragraph, in which case Purchaser shall bear such cost."

Relying upon this provision, the trial court held that Hallberg may be entitled to an award of attorney fees if he establishes that the "amount of his recovery *** exceeds five percent of the CPP as calculated by plaintiffs."

¶ 112    Plaintiffs contend that the trial court erred in relying upon article 3.2(d) of the APA in holding that Hallberg may be entitled to attorney fees in connection with his counterclaim. According to plaintiffs, the language of article 3.2(d) makes it clear that the provision applies only to the costs of retaining an arbitrator in an arbitration proceeding, and that it has no application to attorney fees–even in that limited context. Plaintiffs therefore argue that the trial court's judgment on this issue must be reversed. We agree.

¶ 113    A trial court's ruling on whether to award attorney fees is a question of law, which is reviewed *de novo*. *Peleton, Inc. v. McGivern's, Inc.*, 375 Ill. App. 3d 222, 225 (2007). It is well-settled that a trial court "may only award attorney fees if they are expressly authorized by statute or by agreement of the parties." *Estate of Downs v. Webster*, 307 Ill. App. 3d 65, 70 (1999).

¶ 114    As noted, although the trial court relied upon article 3.2(d) of the APA in awarding Hallberg attorney fees to the extent that he can establish that the amount of his recovery on his CPP claim exceeds 5% of the amount of CPP as calculated by plaintiffs, the plain language of that provision relates exclusively to the parties' responsibility for the costs paid to an arbitrator in an arbitration relating to a dispute concerning the CPP. By its own terms, this provision does not apply outside of the arbitration context.

¶ 115    We conclude that the trial court erred in awarding conditional attorney fees to Hallberg. Accordingly, the trial court's judgment on this issue is reversed.

¶ 116                   B. Did the Trial Court Err in Failing to Award Purchasers
                        Statutory Prejudgment Interest for the Period of Time
                        From the Court's Initial Award in Favor of Plaintiffs
                        to the Date of the Final Judgment?

¶ 117    Plaintiffs' final contention is that they were entitled to statutory prejudgment interest on their award of damages for defendants' breach of the restrictive covenants. Plaintiffs calculate the period of prejudgment interest to run from the time the trial court made the award on November 21, 2008 until the court's entry of its order and judgment on January 20, 2009.

¶ 118    Section 2-1303 of the Code of Civil Procedure governs prejudgment interest:

"Judgments recovered in any court shall draw interest at a rate of 9% per annum from the date of the judgment until satisfied ***. When judgment is entered upon any award, report or verdict, interest shall be computed at the above rate, from the time when made or rendered to the time of entering judgment upon the same, and included in the judgment." 735 ILCS 5/2-1303 (West 2004).

¶ 119    A trial court's decision to award statutory prejudgment interest is reviewed for an abuse of discretion. *Jahn v. Kinderman*, 351 Ill. App. 3d 15, 22 (2004). The generally recognized basis for an award of prejudgment interest is the need to grant an award to make a deprived plaintiff whole. *Id*.

¶ 120    Here, plaintiffs contend that "the trial court omitted pre-judgment interest from the judgment it entered on January 20, 2009, and did not correct this omission in its September 8, 2009 order resolving the parties' post-trial motions." Indeed, the court's January, 2009, 31-page order and judgment does not address the issue of prejudgement interest on the award given to plaintiffs for defendants' breaches of the restrictive covenants. Moreover, although the parties briefed the issue of prejudgment interest on this award in their posttrial motions, it was not specifically addressed by the court in its September 2009 order, which ruled on all posttrial motions. That order simply states that "[b]oth plaintiffs' *** and defendants' *** post-trial motions are denied," except for the court granting postjudgment interest to both plaintiffs and defendants on their respective judgments and making a change in one passage of the court's prior order.

¶ 121    Its is well settled that a court abuses its discretion when it "acts arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeds the bounds of reason and judgment and ignores recognized principles of law." *Id*. Here, the record does not reveal the trial court's basis for denial of plaintiffs' request for prejudgment interest on their award. Accordingly, we are unable to determine whether this denial was a proper exercise of the court's discretion. Therefore, we reverse that ruling and remand this cause to the trial court solely for further consideration of the prejudgment interest issue. See *Id.* at 24 (cause remanded to circuit court for further consideration of postjudgment interest

-23-

issue where record was silent regarding trial court's denial of award).

¶ 122                                    CONCLUSION

¶ 123        For the foregoing reasons, in case No. 01-10-0428, the judgment of the circuit court is affirmed in all respects. With regard to case No. 01-09-2385, the judgment of the circuit court is reversed in all respects. We remand this cause to the circuit court for further proceedings solely on the issue of whether prejudgment interest should be awarded on plaintiffs' judgment against defendants for their breach of the restrictive covenants.

¶ 124        Affirmed in part and reversed in part; cause remanded.