**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190581-U

Order filed April 1, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| HEARTLAND POLYMERS REALTY, INC., an Illinois Corporation, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0581 Circuit No. 10-L-400 |
| POLYCHEM SERVICES, INC., an Illinois Corporation and JOHN HART, Individually, | ) ) ) | |
| Defendants-Appellees. | ) ) | Honorable Jodi Melinda Hoos, Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Justice Lytton concurred in the judgment.
Justice Holdridge specially concurred.

**ORDER**

¶ 1    *Held*:  The trial court erred by excusing defendants-appellees from performing under the promissory note and the guaranty.

¶ 2    Defendant, Polychem Services, Inc. (defendant-purchaser), its vice president, defendant, John Hart, and plaintiff Heartland Polymers Realty, Inc. (plaintiff-seller), executed several agreements related to the sale of a chemical processing plant. Plaintiff-seller filed a lawsuit against defendant-purchaser and Hart, alleging breaches of the terms of a promissory note and a

guaranty. After a bench trial, the trial court entered judgment in favor of defendant-purchaser and Hart. Plaintiff-seller appeals.

¶ 3                                    I. BACKGROUND

¶ 4         In late 2008, plaintiff-seller agreed to sell a chemical processing plant to defendant-purchaser. As part of the transaction, plaintiff-seller and defendant-purchaser executed a promissory note and an agreement regarding the removal and disposal of unusable chemical materials on the premises. Further, Hart, the vice president of defendant-purchaser, executed a guaranty to secure defendant-purchaser's payment of the promissory note. In late 2010, plaintiff-seller filed a lawsuit in the circuit court of Peoria County, alleging defendant-purchaser and Hart failed to comply with the terms of the promissory note and the guaranty. Following a bench trial, the trial court entered judgment in favor of defendant-purchaser and Hart.

¶ 5                        A. The Sale of the Chemical Processing Plant

¶ 6         On November 4, 2008, Hart, as vice president of defendant-purchaser, executed an agreement for the purchase of a chemical processing plant (purchase agreement) with plaintiff seller. Defendant-purchaser agreed to pay $1,350,000 and execute a promissory note in the amount of $200,000 to pay for the chemical processing plant. Together with the chemical processing plant, defendant-purchaser agreed to purchase "all the raw materials and *usable* chemical located on the premises, being more particularly described on the attached Exhibit 'C.' " (Emphasis added.)

¶ 7         Defendant-purchaser did "not purchase nor take possession of any *unusable* chemical or hazardous substances or waste generated by [plaintiff-seller]." (Emphasis added.) Plaintiff-seller was to "remain the owner and responsible for *** [the] unusable chemical or hazardous substances and waste." The purchase agreement stated, "[t]he terms and conditions [for] the

2

removal and disposal of any such unusable chemical or hazardous substances or waste generated are contained in the Removal and Disposal Agreement executed contemporaneously with" the purchase agreement.

¶ 8    The separate removal and disposal agreement, executed by Hart on behalf of defendant-purchaser, recognized financing for the sale of the chemical processing plant was contingent on the removal and disposal of the unusable inventory.[1] The parties agreed it was in their interests to provide for the removal and disposal of the unusable inventory at the time of the closing. Therefore, the parties attached, as an exhibit to the removal and disposal agreement, "a Waste Management Plan *** developed by JAS Environmental, Inc. *** [designating] the methods, manner and protocol for the removal and disposal of the Unusable Inventory." After the closing, plaintiff-seller was required to "engage JAS Environmental, Inc. to perform all of the tasks set forth in the Waste Management Plan" and to "remain the owner of the Unusable Inventory." Defendant-purchaser would, "[a]t no time," become the owner of the unusable inventory.

¶ 9    Further, the removal and disposal agreement required that $300,000 be withheld from the sale proceeds at the closing and placed in plaintiff-seller's name in escrow at Harris Bank for the payment of "invoices in connection [with] the work performed by JAS Environmental." If costs to remove and dispose of the unusable inventory did not exceed the $300,000 deposited in escrow, then the remaining funds were required to "be paid to [plaintiff-seller] and *** applied to the principal due on the *** Promissory Note of $200,000." If the total cost for the removal and disposal of the unusable inventory exceeded the amount deposited in escrow, then defendant-purchaser was required to pay said amounts.

---

[1]A list of unusable inventory was attached as an exhibit to the removal and disposal agreement.

¶ 10    Over one month later, on December 18, 2008, Hart executed the promissory note in the amount of $200,000, plus 6.5% interest, on behalf of defendant-purchaser. Defendant-purchaser agreed to pay plaintiff-seller $3,913.23 per month beginning on March 17, 2009, and ending on March 17, 2014. In the event of a default by defendant-purchaser, the holder of the promissory note could "declare all unpaid indebtedness *** immediately due and payable." Defendant-purchaser would then be obligated to "pay all costs of collection, including a reasonable attorney's fee."

¶ 11    On December 18, 2008, Hart, individually and not as vice president of defendant-purchaser, executed a guaranty to secure payment of the promissory note. Hart "absolutely, unconditionally, and irrevocably" guaranteed the following:

> "the full and prompt payment of the payments when due and as required under the terms and conditions of the Promissory Note, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, and the prompt payment of all sums which may now be or may hereafter become due and owing under the Promissory Note."

¶ 12    On November 1, 2010, plaintiff-seller sent a notice of default to defendant-purchaser and Hart, stating defendant-purchaser failed to pay the October 17, 2010, payment on the promissory note. Plaintiff-seller informed defendant-purchaser and Hart of its intent to declare all unpaid indebtedness under the promissory note immediately due and payable, unless the default was cured within 30 days. Also, plaintiff-seller stated it would initiate legal proceedings against defendant-purchaser and Hart under the purchase agreement, promissory note, and guaranty, if the default was not cured within 30 days.

4

¶ 13                              B. Plaintiff-Seller's Lawsuit

¶ 14          On May 17, 2011, plaintiff-seller filed a three-count, first amended complaint against defendant-purchaser and Hart. Count I alleged a breach of the promissory note by defendant-purchaser. Plaintiff-seller stated that, despite its November 1, 2010, notice of default of the promissory note, defendant-purchaser "failed to make the monthly payment due on October 17, 2010." In addition, plaintiff-seller alleged that defendant-purchaser failed to make the payments due under the promissory note on November 17, 2010, and December 17, 2010. As a result of these breaches by defendant-purchaser, plaintiff-seller alleged it was immediately owed $143,528.55 on the promissory note, interest in the amount of $794.34, and attorney fees.

¶ 15          Count II of the first amended complaint alleged a breach of the guaranty by Hart. Plaintiff-seller alleged that, despite its November 1, 2010, notice of default of the promissory note, Hart "failed to make any payment required by his Guaranty." Plaintiff-seller requested that Hart pay $143,528.55 on the promissory note, plus interest, and attorney fees.[2][3]

¶ 16          On May 18, 2011, defendant-purchaser and Hart filed a joint answer, defense, and counterclaim to plaintiff-seller's first amended complaint.[4] In their defense, defendant-purchaser and Hart alleged, under the removal and disposal agreement, plaintiff-seller was required to remove and dispose of "all material deemed unusable by [defendant-purchaser], whether or [not]

---

[2]Count III of the first amended complaint requested a declaratory judgment against defendant-purchaser. Plaintiff-seller alleged that it was owed all of the escrow funds remaining at Harris Bank after the removal and disposal of the unusable inventory from the chemical processing plant. Plaintiff-seller subsequently depleted the escrow funds to remove additional waste from and remediate other issues at the chemical processing plant. Therefore, plaintiff-seller submits on appeal that count III is moot.

[3]At the close of its case in chief, plaintiff-seller moved, without objection, to amend its first amended complaint to "increas[e] the damage amount to $235,852.26."

[4]On April 26, 2019, the trial court, pursuant to a motion filed by defendant-purchaser and Hart, voluntarily dismissed the counterclaim against plaintiff-seller.

5

expressly listed on the Unusable Inventory *** exhibit." However, despite notice, plaintiff-seller "failed and refused to remove all of the 'Unusable Inventory' from the plant."

¶ 17    C. Administrative Order from the United States Environmental Protection Agency

¶ 18    On September 27, 2012, the United States Environmental Protection Agency (US EPA) issued an administrative order to plaintiff-seller and defendant-purchaser, providing "for the performance of response actions including waste characterization, waste removal and remediation of any releases of Solid Waste or Hazardous Waste." In its findings of fact, the US EPA found as follows:

> "[Plaintiff-seller] and [defendant-purchaser] *** entered into a Removal and Disposal Agreement *** for the removal and off-site disposal of waste materials left at the Site from [plaintiff-seller's] operations (described *** as the 'Unusable Inventory'). Under the Removal and Disposal Agreement, [plaintiff-seller] and [defendant-purchaser] *** agreed to establish an escrow account at Harris Bank at the time of closing *** for the sole purpose of coordinating and ensuring payment for the removal and disposal of the Unusable Inventory ***. [Plaintiff-seller] hired JAS Environmental, Inc. (JAS), to perform all of the tasks set forth in a Waste Management Plan developed by JAS *** to carry out the requirements of the Removal and Disposal Agreement. Funds from the escrow account were used to remove and dispose of some or all of the Unusable Inventory pursuant to the Waste Management Plan, and as of September 30, 2010, $97,902.26 remained in the escrow account at Harris Bank. Solid and/or Hazardous Waste remained at the Facility following the removal and disposal of

6

some or all of the Unusable Inventory pursuant to the Removal and Disposal

Agreement and Waste Management Plan."

The administrative order stated that the parties were "jointly and severally responsible for

carrying out all actions required of them" by the administrative order. On March 24, 2017, five

years after the issuance of the administrative order, the US EPA sent a letter to the parties,

finding all work required by the administrative order was complete. The US EPA informed the

parties that the administrative order was terminated and satisfied.

¶ 19                                                            D. Bench Trial

¶ 20          On May 6, 2019, the trial court conducted a bench trial on plaintiff-seller's first amended

complaint. The trial court received testimony from plaintiff-seller's president, John Joseph

Balaco, defendant-purchaser's vice president, John Hart, and JAS Environmental consultant,

Jeffrey Stofferahn. We summarize the contents of the witnesses' testimony below.

¶ 21                              1. John Joseph Balaco—President of Plaintiff-Seller

¶ 22          Balaco testified that he and other investors formed plaintiff-seller in late 2002, after

which the investors purchased the chemical processing plant. The chemical processing plant's

financial status was "never very strong." During 2007, plaintiff-seller received violation notices

from the Illinois Environmental Protection Agency (Illinois EPA). These violation notices

related to the operations and labeling of materials at the chemical processing plant.

¶ 23          Around this time, it became obvious to the investors that the business at the chemical

processing plant would not survive. The investors began discussing the terms for a sale of the

chemical processing plant to Chemtech Services, Inc., which was owned by Hart. In January

2008, Balaco, acting on behalf of plaintiff-seller, and Hart, acting on behalf of Chemtech

Services, Inc., finalized a letter of intent to purchase the chemical processing plant. Consistent

7

with the terms of the purchase agreement, defendant-purchaser, as lessee, took possession of the chemical processing plant in March 2008.

¶ 24    In the summer of 2008, the Illinois EPA visited the site of the chemical processing plant due to "concern about what was in some of the tanks." Around this time, a phase I environmental site assessment raised concerns regarding "the inventory *** and *** what should be done with it." This caused Harris Bank to incorporate a funding contingency on the sale of the chemical processing plant, requiring the removal of unusable inventory from the chemical processing plant or, at least, a plan financed through escrow for the removal of the unusable inventory.

¶ 25    As part of the removal and disposal agreement, JAS Environmental was hired to remove the unusable inventory. Balaco believed JAS Environmental began the removal process in late 2008 and completed the removal process in late 2009. After the purported completion of the removal process in late 2009, plaintiff-seller requested the remaining escrow funds at Harris Bank. However, plaintiff-seller's request was denied by Harris Bank. Plaintiff-seller was informed that defendant-purchaser "identified *** additional materials they want[ed] removed."

¶ 26    Plaintiff-seller requested that defendant-purchaser provide a list of the additional materials requiring removal from the chemical processing plant. Plaintiff-seller was "willing to discuss what plan needed to be developed and whether [plaintiff-seller] would pay for it." According to Balaco, defendant-purchaser never submitted the list requested by plaintiff-seller.

¶ 27    In October 2010, defendant-purchaser stopped making payments on the promissory note executed by the parties and contemplated by the purchase agreement. On November 1, 2010, Balaco arranged for the notice of default of the promissory note to be sent to defendant-purchaser and Hart. Following the notice, defendant-purchaser failed to cure the default and no additional payments were made pursuant to the promissory note and/or the guaranty.

¶ 28    Meanwhile, the Illinois EPA and US EPA made six or seven total visits to the chemical processing plant between 2008 and 2012. In September 2012, the US EPA identified additional unusable inventory materials to be removed from the chemical processing plant. As such, plaintiff-seller "hired a company and funded the removal [of those additional inventory materials] from the escrow account." After the removal of these materials and the remediation of other issues, all remaining escrow funds at Harris Bank were depleted. Balaco stated that the removal and remediation processes were completed between 2013 and 2015, "but the paperwork drug on" until the US EPA issued its completion letter on March 24, 2017.

¶ 29    2. John Hart—Vice President of Defendant-Purchaser

¶ 30    John Hart is a mechanical engineer, owner of Chemtech Services, Inc., and minority shareholder and vice president of defendant-purchaser. Hart stated, "unfortunately, at the time of the preparation [of the parties' agreements], *** there were no inventory records indicative of the magnitude of the waste being stored at the plant." Similarly, regarding the labeling of inventory, Hart stated, "[t]he materials in the bulk tanks certainly were not clearly indicated." Due to plaintiff-seller's failure to keep inventory records or properly labeled inventory, the process of identifying and quantifying the waste materials requiring removal from the chemical processing plant, before Harris Bank would provide financing, was "made more complicated."

¶ 31    Hart testified that, after the US EPA became involved in late 2010, defendant-purchaser was forced to shut down the chemical processing plant for a period of weeks. According to Hart, during this time, defendant-purchaser lost customers and, "in terms of revenue, *** $500,000 per year." While complying with the US EPA's administrative order, defendant-purchaser estimated losses totaling "[$]200,000 to $300,000 over a series of years."

¶ 32                    3. Jeffrey Stofferahn—Owner of JAS Environmental, Inc.

¶ 33          Jeffrey Stofferahn is an environmental consultant who owns JAS Environmental, Inc.,

which is the corporation referenced in the parties' removal and disposal agreement. Stofferahn

developed the parties' waste management plan in late 2008 and early 2009, then was hired to

implement the final version of that plan at the chemical processing plant. Stofferahn's task was

to "characteriz[e] waste materials that were identified as being unusable inventory and then

find[] disposal avenues for that material."

¶ 34          In terms of the removal process, Stofferahn testified, "[t]here were additional materials

that were *** identified *** once the implementation of the plan began." That is, "there ended

up being a lot more drums than what the original *** poundage inventory *** would have

correlated into." Periodic updates were provided by Stofferahn to the parties, including of "new

inventory as it was identified" and unusable materials removed from the chemical processing

plant. When asked if the plan was completed, Stofferahn stated, plaintiff-seller indicated "based

on the amount of waste materials *** removed during the course of [the] project[,] *** they felt

their obligations were fulfilled." Balaco requested a letter stating, "we have removed a volume of

waste that was *** functionally equivalent to the volume represented in the plan."

¶ 35                              E. Judgment of the Trial Court

¶ 36          At the conclusion of the bench trial on May 6, 2019, the trial court took the matter under

advisement. On August 30, 2019, the trial court entered judgment for defendant-purchaser and

Hart. The trial court's order included a finding that the additional or unidentified waste discussed

during the bench trial was contemplated in the purchase agreement's broad statement that

"[defendant-purchaser] does not purchase nor take possession of any unusable chemical or

hazardous substances *or waste generated by [plaintiff-seller]*." (Emphasis added.) Although the

10

removal and disposal agreement separated substances into usable and nonusable inventory, the trial court found that the property where the chemical processing plant was situated "had a lot of material on it that could not be packaged *** [as] usable or non-usable."

¶ 37    The trial court reasoned that, due to the size of the chemical processing plant, the lists of usable and nonusable inventory "could not possibly have covered everything." The trial court noted plaintiff-seller, despite failing to keep business records, owned the chemical processing plant to begin with and knew or should have known what waste was located on the property. The trial court concluded that, under the purchase agreement, "[m]aterials not listed as either usable or non-usable *** simply f[ell] back to 'waste' belonging to [plaintiff-seller]." Therefore, plaintiff-seller owned and was required to dispose of that waste. The trial court did not make express findings under each count of plaintiff-seller's first amended complaint.

¶ 38    On September 30, 2019, plaintiff-seller timely appealed the judgment of the trial court.

¶ 39                                    II. ANALYSIS

¶ 40    This appeal involves a 2010 lawsuit resulting in a final judgment in favor of defendant-purchaser and Hart following a 2019 bench trial on plaintiff-seller's first amended complaint. Essentially, the trial court found that defendant-purchaser and Hart, in light of plaintiff-seller's material breach of the purchase agreement and the removal and disposal agreement, were relieved of all contractual duties to pay the balance of the promissory note.

¶ 41    For a better understanding of the parties' positions on appeal, we briefly restate the undisputed facts and procedural history. The parties executed the purchase agreement and the removal and disposal agreement on November 4, 2008. Thereafter, defendant-purchaser, already in possession of the chemical processing plant, began periodic payments to plaintiff-seller for the premises, as required by the purchase agreement and the promissory note that was executed

11

along with Hart's guaranty on December 18, 2018. However, in October 2010, defendant-purchaser ceased payments on the promissory note. Despite notice of default of the promissory note, sent by plaintiff-seller to defendant-purchaser and Hart on November 1, 2010, neither defendant-purchaser nor Hart resumed payments under the promissory note.

¶ 42        Plaintiff-seller initiated this lawsuit against defendant-purchaser and Hart in December 2010 to enforce and collect the balance due on the promissory note. Plaintiff-seller's first amended complaint was filed on May 17, 2011. Defendant-purchaser and Hart defended against the first amended complaint by filing an affirmative defense and counterclaim for specific performance and/or damages against plaintiff-seller, alleging plaintiff-seller materially breached the purchase agreement and the removal and disposal agreement by failing to timely remove all unusable waste from the chemical processing plant.

¶ 43        On September 27, 2012, the US EPA ordered the parties to remove the unusable waste from the chemical processing plant, which was presently under the operation of defendant-purchaser. On March 24, 2017, the US EPA issued a completion letter, finding all cleanup work at the chemical processing plant was successfully completed. At no time after this date did defendant-purchaser or Hart resume payments on the promissory note, despite the fact that defendant-purchaser remained in possession of and continued to operate its business on the premises. Similarly, defendant purchaser and Hart did not, at any time, seek to rescind or revoke the parties' agreements, return possession of the chemical plant to plaintiff-seller, or demand additional performances by plaintiff-seller under the parties' agreements.

¶ 44        After the US EPA's completion letter, issued on March 24, 2017, but before the bench trial on May 6, 2019, defendant-purchaser and Hart voluntarily dismissed their counterclaim for specific performance and/or damages attributable to plaintiff-seller's alleged material breach of

12

the parties' agreements. Therefore, at the time of the bench trial, the sole issue to be resolved by the trial court was whether the affirmative defense raised by defendant-purchaser and Hart barred plaintiff-seller from proving that it substantially complied with the material terms of the parties' agreements.[5] See *Israel v. National Canada Corp.*, 276 Ill. App. 3d 454, 461 (1995). In other words, once the counterclaim was voluntarily dismissed, the monetary damages suffered by defendant-purchaser and Hart, if any, caused by plaintiff-seller's alleged material breach, was no longer an issue to be resolved by the trial court.

¶ 45        We acknowledge that there was a period when the chemical processing plant was shut down for the parties to comply with the US EPA's administrative order. However, this was obviously not an unforeseen shut down because defendant-purchaser purchased the chemical processing plant knowing plaintiff-seller, in collaboration with JAS Environmental, would engage in a process of removing unusable waste materials from the premises. Regardless, as alluded to above, the trial court lost the ability to offset any purported damages caused by a work stoppage once defendant-purchaser and Hart voluntarily dismissed their counterclaim.

¶ 46        Nonetheless, the trial court, without explaining its rationale, relieved defendant-purchaser and Hart from their duty to pay the balance due and owing on the promissory note, which, according to plaintiff-seller, totaled $235,852.26. On appeal, plaintiff-seller argues, since its alleged material breach of the parties' agreements was undisputedly cured two years before the bench trial, the trial court erroneously discharged defendant-purchaser and Hart from their contractual duty to pay this remaining balance for the chemical processing plant. Following our careful review, we agree with plaintiff-seller that the trial court's ruling was legally erroneous.

---

[5]We note that a material breach of contract is not a defense that must be affirmatively pled in an answer. See 735 ILCS 5/2-613(d) (West 2010).

13

¶ 47    In most cases, "the standard of review [after] a bench trial is whether the order or judgment [wa]s against the manifest weight of the evidence." *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12; See also *International Supply Co. v. Campbell*, 391 Ill. App. 3d 439, 447-48 (2009) (our court stating the trial court's factual findings after a bench trial must be given deference on appeal, such that a reversal is warranted only if they were against the manifest weight of the evidence). However, our review focuses on whether the trial court correctly excused, after a bench trial on plaintiff-seller's first amended complaint, defendant-purchaser and Hart's performance of their contractual duties under the promissory note and the guaranty. This question is reviewed *de novo*. See *Campbell*, 391 Ill. App. 3d at 447-48.

¶ 48    For purposes of an efficient resolution of this appeal, we will assume, *arguendo*, that plaintiff-seller materially breached both the purchase agreement and the removal and disposal agreement by initially failing to remove all unusable waste materials from the chemical processing plant. Our supreme court has stated, "[u]nder general contract principles, a material breach of a contract provision by one party *may* be grounds for releasing the other party from his contractual obligations." *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 70 (2006). (Emphasis added.); See also *Galesburg Clinic Ass'n v. West*, 302 Ill. App. 3d 1016, 1018 (1999) (Our court stating, "a breach of a partnership agreement *can* operate to discharge the duties of a covenant not to compete where the breach is material.") (Emphasis added.)

¶ 49    However, the facts of this case are unique. Defendant-purchaser and Hart's obligations under the promissory note and the guaranty were not automatically discharged because neither party sought to walk away from the parties' agreements. Instead, during the time the parties were complying with the US EPA's administrative order, defendant-purchaser was in possession of and continued its business operations on the premises. This was despite not paying plaintiff-

14

seller for the premises since before October 2010. Again, we emphasize that defendant-purchaser and Hart did not seek to rescind or revoke the parties' agreements due to the delay in the removal of unusable waste materials from the chemical processing plant.

¶ 50    We conclude that once plaintiff-seller's alleged material breach was cured, defendant-purchaser and Hart could not be discharged from their duty to pay for the chemical processing plant. As a result, we hold, based on the procedural posture of this case, the trial court erred by relieving and discharging defendant-purchaser and Hart from their contractual duties under the promissory note and the guaranty. See *Mohanty*, 225 Ill. 2d at 70; *Galesburg Clinic*, 302 Ill. App. 3d at 1018; see also Restatement (Second) of Contracts §§ 241-42 (1981). Therefore, we reverse the trial court's judgment for defendant-purchaser and Hart and remand the matter for the trial court to enter judgment in favor of plaintiff-seller for the amount due on the promissory note plus interest from the date that the US EPA found the alleged material breach was cured, March 24, 2017. On remand, the trial court is also directed to determine whether defendant-purchaser and Hart's failure to comply with the terms of the promissory note and the guaranty warrant an award of reasonable attorney fees to plaintiff-seller.

¶ 51                                    III. CONCLUSION

¶ 52    The judgment of the circuit court of Peoria County is reversed and remanded with directions.

¶ 53    Reversed and remanded with directions.

¶ 54    JUSTICE HOLDRIDGE, specially concurring:

¶ 55    I agree that the trial court erred by excusing the defendant-purchaser from performing under the promissory note and the guaranty. I therefore join the majority's judgment. However, I would have reversed the trial court's decision on different grounds. In my view, the defendant-

15

purchaser failed to show that the plaintiff-seller's initial failure to remove certain waste material from the property was a material breach of the parties' agreements.

¶ 56 Only a material breach of a contract provision will justify non-performance by the other party. *InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 43; *Israel v. National Canada Corp.*, 276 Ill. App. 3d 454, 461 (1995). The test of whether a breach is "material" is whether it is "so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement." *InsureOne,* 2012 IL App (1st) 092385, ¶ 43. "The breach must be so material and important to justify the injured party in regarding the whole transaction at an end." *Id.* The issue of whether a material breach of contract has been committed is a question of fact, and the trial court's judgment will not be disturbed unless it is against the manifest weight of the evidence. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 72 (2006); *InsureOne*, 2012 IL App (1st) 092385, ¶ 43.

¶ 57 No material breach occurred in this case. Plaintiff-seller's delay in removing all of the waste from the property did not defeat the objects of parties, substantively change the nature of the parties' mutual performance, or justify the defendant-purchaser in concluding that the transaction was at an end. Even assuming *arguendo* that the waste that the plaintiff-seller delayed in removing was covered by the parties' agreements (which is not clear), it is undisputed that the plaintiff-seller removed *all* chemical waste as of March 24, 2017, thereby curing any alleged breach. From the time the defendant-purchaser ceased making payments on the promissory note in October 2010 through the time that the plaintiff-seller removed all of the waste in March 2017, the defendant-purchaser continued to possess and operate the plant. During that period, the defendant-purchaser did not seek to rescind or revoke the agreements, return the premises to the

16

plaintiff-seller, or seek monetary damages from the plaintiff-seller for any alleged material breach.

Clearly, the defendant-purchaser did not consider the agreement between the parties to have ended.

To the contrary, it acted as if the agreements were in full force and effect and retained the principal

benefits of the bargain without seeking any legal recourse against the plaintiff-seller. Nevertheless,

the defendant-purchaser stopped making payments on the promissory note and did not resume

making payments even after the plaintiff-seller had cured any alleged breach by removing all of

the waste. Accordingly, the trial court's implicit finding[6] that the plaintiff-seller had materially

breached the agreements was against the manifest weight of the evidence.

---

[6] The trial court did not expressly find that the plaintiff-seller had committed a material breach of the agreements. However, a trial court need not make any findings of fact, and the failure of the trial court to make a specific finding is not grounds for reversal; in reviewing a judgment, the appellate court will assume that all issues and controverted facts were found in favor of the prevailing party. *Golf Trust of America, L.P. v. Soat*, 355 Ill. App. 3d 333, 337 (2005). The question before the appellate court is not whether the trial court made a specific finding, but whether its final determination is correct. *Id.*